**AETNA LIFE AND CASUALTY COMPANY, Appellant,**

v.

**HAMPTON STATE BANK, Appellee.**

No. 18036.

Court of Civil Appeals of Texas, Dallas.

May 31, 1973.

Rehearing Denied June 28, 1973.

C. Edward Fowler, Jr., Bailey, Williams, Westfall & Henderson, Dallas, for appellant.

Bill J. Stephens, Stephens & Stephens, Dallas, for appellee.

GUITTARD, Justice.

Hampton State Bank sued Aetna Life and Casualty Company on an insurance contract called a "banker's blanket bond" for a loss resulting from a forged check. Aetna answered that no insured loss occurred, since Hampton forwarded the check through banking channels to the drawee, Northwest National Bank, and after Northwest paid the check, Hampton asked Northwest to send it back and voluntarily refunded the payment. In order to determine whether an insured loss occurred, we must decide whether Hampton was legally required to make this repayment. We hold that repayment was not required and, consequently, that the loss was not insured.

The facts are undisputed and are stated in the trial court's findings of fact. The check in question was drawn on an account in Northwest National Bank in the name of Pizza Inn, Inc. Check forms furnished by Northwest to Pizza Inn, Inc. were stolen and one of these forms was filled in with the amount of $4,000 payable to the order of "Pizza Inn, Inc., # 32." This name was fictitious, since no "Pizza Inn, Inc. # 32" existed. The signature of F. J. Spillman, president of Pizza Inn, Inc., was forged to the check in a credible likeness of the signature of that officer on file with Northwest. The forged check was endorsed "Pizza Inn, Inc. # 32 For Deposited Only, Account No. (Op1275 5) Ronnie Couch," and was deposited in an account opened under that number in the name of "Pizza Inn, Inc. No. 32" in Hampton State Bank. Hampton credited this account with $4,000, endorsed the check "Pay Any Bank P.E.G.," which in banking parlance means "prior endorsements guaranteed," and forwarded it for collection through banking channels to Northwest, which ran the check through its computer and, in accordance with its practice, compared the signature with the signature of F. J. Spillman on file, failed to discover the forgery, and paid Hampton for the check.

About twenty-two days later Hampton advised Northwest that the $4,000 check was forged, and that it intended to make a claim against its bonding company for it, and requested Northwest to return it. Accordingly, Northwest returned the check through banking channels to Hampton, which accepted it and repaid the $4,000 to Northwest. The trial court found that when Hampton requested return of the check it knew all the facts and was fully aware of any right which it may have had to claim that Northwest by accepting and paying the check could not recover the $4,000 from it. Hampton paid out $3,953.-10 from the fictitious account before discovering the forgery, and the trial court found that it suffered a loss in that amount.

By the terms of its bond, Aetna agreed to indemnify Hampton and hold it harmless against certain losses, including "any loss through FORGERY . . . of, on or in any checks. . . ."

The trial court rendered judgment for Hampton for the amount of the loss. The court found and concluded that Hampton breached its warranty of the endorsement in that the endorsement was forged, and that Hampton was not a holder in due course.

 Our first question is whether Hampton breached its warranty of title under Tex.Bus. & Comm.Code Ann. § 4.207 (1968) [1] which, as here pertinent, provides:

"(a) Each . . . collecting bank who obtains payment . . . of an

---

1. All references in this opinion to numbered sections are to Tex.Bus. & Comm. Code Ann. (1968), V.T.C.A., which, so far as here material, is identical with the Uniform Commercial Code.

item . . . warrants to the payor bank . . . that

(1) he has a good title to the item or is authorized to obtain payment . . . on behalf of one who has a good title . . . ."[2]

Hampton contends that since the purported endorsement of the payee, "Pizza Inn, Inc. # 32," as well as the signature of the drawer, was forged, the forged endorsement is inoperative under § 3.404(a):

"Any unauthorized signature is wholly inoperative as that of the person whose name is signed . . . ."

Hampton argues that it acquired no title by the forged endorsement, and, therefore, was liable to Northwest for breach of warranty under § 4.207.

Aetna contends that the endorsement was not inoperative, and that Hampton did not breach its warranty because anyone, even a forger, can effectively endorse the name of a fictitious payee in view of § 3.-405, which provides:

"(a) An indorsement by any person in the name of a named payee is effective if . . .

(2) a person signing as or on behalf of a maker or drawer intends the payee to have no interest in the instrument . . . ."

We conclude that Aetna's interpretation of the Code is correct. The person who forged the check may not have been a "drawer" for all purposes, but he signed "as or on behalf of" the drawer, within § 3.405. Obviously he "intended the payee to have no interest" in the check because the payee was fictitious. Since, under this section, anyone is authorized to endorse on behalf of a person not intended to have any interest in the instrument, the endorsement in the name of "Pizza Inn, Inc. # 32" was effective to pass title to Hampton. It may seem odd to speak of a warranty of title to a forged check, but that is exactly what we have here. Title to a check does not necessarily mean the right to collect it from the drawer, since the drawer may have a good defense. A person (other than the drawee bank) who has paid value for a forged check has title to the spurious instrument which enables him to recover against his transferor under § 3.417(b)(2) and against prior endorsers under § 3.414. A warranty of title is nothing more than an assurance that no one has better title to the check than the warrantor, and therefore, that no one is in a position to claim title as against the warrantee, as the payee or other owner of a genuine check could do if his endorsement were forged. United States v. Guaranty Trust Co., 293 U.S. 340, 55 S.Ct. 221, 79 L.Ed. 415 (1934); First Nat'l Bank of Wichita Falls v. First Nat'l Bank of Borger, 37 S.W.2d 802 (Tex.Civ.App., Amarillo 1931, writ ref'd). On payment of the check to Hampton, Northwest's loss could not be said to have resulted from any breach of Hampton's warranty of title because no person whose name appeared to be endorsed on the check has asserted any claim of title based on lack of a genuine endorsement. Northwest's loss was rather the result of paying out its money on a check to which its own depositor's name was forged.

Hampton also argues that it was liable to Northwest on its express warranty, "P.E.G.," meaning "prior endorsements guaranteed," although it does not enlighten us as to what this express warranty adds to the warranty of title implied under § 4.-207, above quoted. The comment by the commissioners who drafted the Uniform Commercial Code explains that § 4.207 "is intended to give the effect presently obtained in bank collections by the words 'prior indorsements guaranteed' in collection transfers and presentments between banks." Uniform Commercial Code § 4–207, Comment 2. A warranty of endorsements serves only to warrant the title as

---

2. The same warranties on presentment are provided in terms not limited to banks in § 3.417.

against the claim of any person whose name appears as an endorser. Therefore, this express warranty would have afforded no additional ground for Northwest to recover its payment from Hampton.

■ Hampton's argument that its warranty of the endorsement "contributed" to Northwest's loss in paying the forged check and that Northwest was entitled to rely on Hampton's warranty as assurance of the genuineness of the check is equivalent to an assertion that Hampton's warranty of the endorsement amounted also to a warranty of genuineness of the drawer's signature. Adoption of such a rule would expand the warranty beyond that provided in § 4.207, and would be contrary to the better-reasoned decisions before the Code. United States v. Chase Nat'l Bank, 252 U. S. 485, 40 S.Ct. 361, 64 L.Ed. 675 (1920) ; First Nat'l Bank v. United States Nat'l Bank, 100 Or. 264, 197 P. 547 (1921) ; Fidelity & Deposit Co. v. Peoples Exchange Bank, 270 Wis. 415, 71 N.W.2d 290 (1955) ; J. Brady, Bank Checks § 15.16 (4th ed. H. Bailey 1969).

Hampton relies on First Nat'l Bank of Winnsboro v. First Nat'l Bank of Quitman, 299 S.W. 856 (Tex.Comm'n App. 1927), aff'g First Nat'l Bank of Quitman v. Wood County, 294 S.W. 324 (Tex.Civ. App., Texarkana 1927), in which the Commission of Appeals held that a payor bank could recover from a collecting bank money paid out on a forged check made payable to an existing person whose endorsement was also forged. The collecting bank had stamped the check "All prior endorsements guaranteed." The stated ground of the decision was that the action of the collecting bank in accepting the forged endorsement and putting it in circulation with a guarantee of integrity "contributed" to the payment of the forged check. This holding seems to be based on negligence of the collecting bank, since the principal authority cited is Rouvant v. San Antonio Nat'l Bank, 63 Tex. 610 (1885), which allowed recovery by a drawee bank against an endorser in a case where the endorser's negligence in dealing with a forger con-

tributed to the loss. The Supreme Court did not adopt the *Quitman* opinion, but only the judgment, which was sustainable on the negligence theory adopted by the Court of Civil Appeals.

■■ In our opinion, whatever authority *Quitman* may have had was eliminated by enactment of the Uniform Commercial Code. A different decision would now be required under § 3.418, which provides:

"Except for recovery of bank payments as provided in the chapter on Bank Deposits and Collections (Chapter 4) and except for liability for breach of warranty on presentment under the preceding section, payment or acceptance of any instrument is final in favor of a holder in due course, or a person who has in good faith changed his position in reliance on the payment."

According to the commissioners who drafted the Code, this section follows the rule of Price v. Neal, 3 Burr. 1354, 97 Eng.Reprint 871 (1762) and makes payment of a forged check by the drawee bank final in the sense that the bank cannot recover back the payment. Uniform Commercial Code § 3–418, Comment 1. The commissioners explain further that this section rejects decisions permitting recovery on the basis of negligence of the holder in taking the instrument unless the negligence amounts to lack of good faith. *Id.*, Comment 4. The Code sweeps away all exceptions to the Price v. Neal rule and substitutes the more definite standard of good faith for the standard of ordinary care, which has produced confusion and uncertainty. J. Brady, Bank Checks 469 (4th ed. H. Bailey 1969). Consequently, we find no merit in Hampton's argument, based on such pre-code cases as First Nat'l Bank of Quitman v. Wood County, 294 S. W. 324 (Tex.Civ.App., Texarkana 1927), aff'd First Nat'l Bank of Winnsboro v. First Nat'l Bank of Quitman, 299 S.W. 856 (Tex.Comm'n App., 1927), and First State Bank of Bellaire v. Citizens National Bank, 407 S.W.2d 365 (Tex.Civ.App.,

Houston 1966, no writ), that Hampton had a common-law liability to Northwest for negligence in failing to observe the prevailing banking practice of requiring a corporate resolution before permitting withdrawal from an account opened in a corporate name. Under § 3.418, common-law liability is excluded and the controlling question is whether payment of the check by Northwest to Hampton was "final."

We recognize that the rule of finality as stated in § 3.418 expressly excepts liability for breach of warranty, but Hampton was not liable for breach of warranty for reasons already given. Hampton also argues that payment of the check was not final because under § 3.418, payment is final only "in favor of a holder in due course, or a person who has in good faith changed his position in reliance upon the payment" and the trial court found that Hampton was not a holder in due course. Aetna attacks this finding as without support in the evidence. We conclude that Aetna's contention is well taken, since the burden was on Hampton to prove that it was not a holder in due course, and it has failed to carry that burden.

Ordinarily when a defense to the instrument is shown, the burden of proof on the holder-in-due-course issue is on "the person claiming the rights of a holder in due course," as provided in § 3.307(c), but Aetna is not in that position here, since it is simply resisting Hampton's suit on the bond. Hampton has the negative burden to prove that it was not a holder in due course because one of the elements necessary to its recovery on the bond is that it was not a holder in due course when it sent the check to Northwest for payment.

The effect of the trial court's finding that Hampton was not a holder in due course must be determined in the light of the definition of "holder in due course" in § 3.302. Under subdivision (a) of that section, a holder in due course is one who takes the instrument (1) for value, (2) in good faith and (3) without notice of any defense. Consequently, the trial court's finding implies a more particular finding in one or more of the following respects: (1) that Hampton did not take the check for value or (2) that Hampton did not take the check in good faith, or (3) that Hampton took the check with notice of the defense of forgery. We find no evidence to support a finding in Hampton's favor in any of these respects.

Hampton's status as a holder for value is established to the extent of the withdrawals of $3,953.10 from the fictitious account. Section 4.209 provides that a bank "has given value to the extent that it has a security interest in the item," and § 4.208 provides that a bank has such a security interest in an item deposited "to the extent to which credit given for the item has been withdrawn or applied." The effect of these sections is that a collecting bank does not become a holder for value simply by crediting the account of the depositor, but may become such a holder by paying funds out of the account. J. Brady, *supra*, § 4.6.

Hampton argues that these withdrawals did not amount to payment of value for the check because the evidence shows that no withdrawals were properly authorized. Hampton asserts that it obtained no corporate resolution authorizing anyone to make withdrawals from the account, and contends that such a resolution, if furnished, could only have been fraudulent, since the account was carried in a corporate name subsequently discovered to be fictitious. Thus, the argument runs, Hampton must be deemed to have paid out its own funds by permitting the unauthorized withdrawals and to have retained the funds in the fictitious account for the benefit of Northwest, which was true owner because it had been required to restore the money it had paid on the check to the account of Pizza Inn, Inc., against which the forged check had been charged. In support of this argument Hampton cites Hightstown Trust Co. v. American Equity Corporation, 7 N.J.Misc. 135, 144 A. 599, aff'd 106 N.J.L. 569, 150 A. 918 (1930),

which holds that a bank does not become a holder for value of a note when it credits a depositor's account with the amount of the note and later debits such account with the amount of a forged check.

The question of "value" comes to whether under the circumstances the credit allowed for the $4,000 check in the fictitious account "has been withdrawn" within the meaning of § 4.208. We hold that it has been withdrawn. In *Hightstown* the depositor's account was debited with checks drawn without authority of the depositor, but here there is no evidence that the withdrawals were made by anyone other than the person who made the deposit. Since the account was fictitious, whether the depositor furnished a proper corporate resolution is beside the point. Hampton paid out money on the forged check by permitting withdrawals from the account, and to the extent of those withdrawals it was a holder for value. It may well have "paid out its own funds" when the withdrawals were made, but such payment tends to establish rather than negate its status as a holder for value, just as if it had paid its own money in cash for the forged check.

■■ Neither do we find any evidence to support Hampton's claim that it did not take the check in good faith or its claim that it took the check with notice of the defense of forgery. In this respect, as in other aspects of this case, Hampton's posture is unusual. In order to recover against Aetna it must establish that it was liable to reimburse Northwest for the payment it received from Northwest on the forged check. In order to establish liability to Northwest it must show that it was not a holder in due course, and in order to show that it was not a holder in due course it asserts its own lack of good faith in taking the check. It insists that in accepting the check for deposit and permitting withdrawals against the account without obtaining sufficient identification and a proper corporate resolution, it was guilty of gross negligence equivalent to lack of good faith.

We do not agree that Hampton has presented evidence tending to establish its own lack of good faith. The record contains no evidence of the circumstances under which the check was received or the withdrawals permitted. The only employee of Hampton who testified was not employed at the time of the transaction. He identified the bank's ledger sheet for the account, but did not testify concerning any lack of identification or corporate resolution. The only indication in the record that the employee who handled the transaction failed to obtain a corporate resolution was an answer given by Hampton to an interrogatory propounded to it by Northwest in connection with Hampton's claim against Northwest, which was involved in the present suit. The interrogatory asked what inquiry Hampton made with respect to the identity of the party opening the fictitious account to act for Pizza Inn, Inc. or Pizza Inn, Inc. #32. Hampton responded that it was unable to answer what specific inquiry was made, and added: "[A]s a matter of practice the person opening such an account is given a corporate resolution to have properly authenticated by the Secretary of the corporation and returned, which in the instant case was never done." This answer was read into evidence by counsel for Northwest, and no objection was made. However, it has no probative force as against Aetna, because Tex.R. Civ.P. 168 provides that answers to such interrogatories "may be used only against the party answering the interrogatories." Although the answer was admissible against Hampton on its claim against Northwest, by this express provision of the rule it was not admissible in Hampton's claim against Aetna and was in that context nothing more than a self-serving hearsay statement. Thus Hampton is left without any evidence to support the assertion of its own gross negligence.

■ Moreover, we cannot accept Hampton's argument that failure to exercise ordinary care or even gross negligence is equivalent to lack of good faith. "Good faith" is defined in § 1.201(19) as "honesty

88

in fact in the conduct or transaction concerned." "Honesty" in this case would mean accepting the $4,000 check for deposit and permitting withdrawal of funds from the fictitious account without any reason to believe that the check was forged. This record fails to show any lack of honesty in this respect, since it contains no evidence tending to show that Hampton's employee who handled the transaction connived with the forger or had any reason to believe that the check was not genuine. Therefore, there is no evidence to support any implied finding that Hampton did not take the check in good faith or that it took the check with notice of any defense against it.

■ For the reasons stated we hold that the payment by Northwest was "final" within § 3.418 and that Hampton was not liable to return it. It follows that Hampton has failed to establish that it sustained a "loss through forgery" within the coverage of the bond.

The judgment of the district court is reversed and judgment is here rendered that Hampton take nothing by this suit.