NORTH CAROLINA NATIONAL BANK, A NATIONAL BANKING ASSOCIATION v. M. T. HAMMOND, AND FEDERAL RESERVE BANK OF RICHMOND

No. 41

(Filed 4 December 1979)

1. **Uniform Commercial Code § 36— check—allegations of forgery—insufficiency to prove breach of warranty of good title**

    Unproven and contested allegations of forged endorsement on a check are insufficient as a matter of law to breach a warranty of good title under G.S. 25-4-207.

2. **Principal and Agent § 4— endorsement of check for another person—issue as to agency—summary judgment improper**

    Though one defendant alleged that a second defendant had given him an oral "power of attorney" to endorse a check for loan proceeds written by plaintiff bank, defendant's version of the facts indicated that he was acting as the second defendant's general agent, and it was not necessary that the agency be under a written grant of authority; therefore, whether defendant endorsed the check as real or implied agent of the second defendant and the endorsement was therefore valid and not a forgery was a question of fact for the jury, and the trial court erred in granting summary judgment for plaintiff.

DEFENDANT Federal Reserve Bank of Richmond appeals from the decision of the Court of Appeals, 40 N.C. App. 34, 252 S.E. 2d 104 (1979), affirming an order by *Collier, Judge,* in Chambers, Superior Court, IREDELL County, 30 December 1977, granting summary judgment for the plaintiff.

On 5 May 1976, a Statesville branch of plaintiff NCNB loaned $30,000 to one M. T., "Bill," Hammond. Hammond signed a 68-day promissory note in that amount with interest at the prime rate plus one percent. The note was due and payable 12 July 1976. Plaintiff NCNB issued a check for the $30,000 loan proceeds minus interest costs payable to M. T. Hammond on 5 May 1976.

The loan proceeds check was initially deposited in an Alabama bank indorsed "to order of Energon, Inc., M. T. (Bill) Hammond, P.A." and "for deposit only Energon, Inc. by Charlie T. Daniels." The Alabama bank negotiated the check into the federal reserve system for collection. The last collecting bank, the Federal Reserve Bank of Richmond, presented the check to plaintiff NCNB for payment and NCNB paid the Federal Reserve Bank of Richmond the face amount of the check. All prior collecting

banks had stamped the check "PEG" or "prior endorsement guaranteed," pursuant to federal reserve banking regulations.

Hammond never repaid the note. Plaintiff NCNB sued for the $30,000 plus interest and attorney's fees on 3 November 1976. In answer to the complaint, defendant Hammond denied ever having received the $30,000 and later stated that his indorsement on the loan check was neither genuine nor authorized.

Plaintiff NCNB then made timely demand on the last collecting bank, Federal Reserve Bank of Richmond, for the amount of the check. NCNB based its claim on G.S. 25-4-207. If the check was forged, NCNB asserted, the Federal Reserve Bank of Richmond (or Bank) did not have "good title" to it, and had therefore breached the warranty contemplated by G.S. 25-4-207 rendering it liable to NCNB who had ultimately paid funds over the forgery. When the Bank refused the demand, NCNB amended its complaint, making the Bank an additional defendant.

In its answer, the Bank asserted upon information and belief that the indorsement which defendant Hammond claimed was forged had been made at his instruction and by his authorization. It therefore denied liability.

After a period of discovery, plaintiff NCNB moved for summary judgment, attaching to its motion an affidavit of defendant Hammond which stated that the signature on the check indorsement was not his and had not been made at his authorization. NCNB also included an affidavit of a handwriting expert stating that, in his opinion, the signature on the indorsement was not defendant Hammond's.

In its reply to the motion, defendant Bank attached the affidavit and deposition of Raymond M. Robbins, Jr., which stated, *inter alia*, that Robbins and Hammond were involved in beginning some kind of mining operation in Alabama apparently called Energon, Inc., that Robbins was unable to raise capital for the venture, that defendant Hammond had agreed to borrow the needed amount and that NCNB was then approached about the loan. Robbins further averred that Hammond had signed the NCNB note some time in advance of 5 May 1976 and had gone on a Hawaiian vacation soon after. On 5 May, when the loan was approved, Robbins had received the loan proceeds check from NCNB in States-

ville and delivered the check to defendant Hammond at the Birmingham, Alabama, airport. Hammond was en route home to Statesville from his Hawaiian vacation. Robbins asserted that neither he nor defendant Hammond had a pen at that time and that defendant Hammond expressly gave him permission to indorse the check, along with instructions to deposit it to the account of Energon, Inc., and to use it to pay two outstanding bills of the company. Robbins stated that he returned from the airport and indorsed the check in the presence of two other shareholders in Energon, one of whom, Charlie Daniels, then indorsed the check to the deposit of Energon and deposited it.

Defendant Bank, in addition to Robbins' deposition, included portions of a deposition of defendant Hammond wherein Hammond stated that at one time he was president of Energon and was still a shareholder of the corporation but that he had not been president of the company on the date the loan check was indorsed with his name.

Based on these affidavits and depositions, NCNB again moved for leave to amend their complaint to join Robbins as a defendant. The trial judge allowed joinder of defendant Robbins and granted summary judgment for plaintiff NCNB against the defendant Bank, finding as a matter of law that under G.S. 25-4-207, the Federal Reserve Bank of Richmond warranted and represented to the plaintiff NCNB that as a collecting bank, it had good title to the check and that all indorsement signatures thereon were genuine or authorized; that the Federal Reserve Bank of Richmond did not have good title to the check because of the alleged forgery which "therefore meant that it did not have a marketable title, which was free from reasonable doubt;" and that it was liable under this breach of warranty. It ordered defendant Bank to pay plaintiff NCNB the amount of the check plus interest, costs and attorneys' fees.

Defendant Bank appealed. The Court of Appeals affirmed the judgment of the trial court. Citing the language of G.S. 25-4-207 (2), that court reasoned that defendant Bank had breached its warranty of good title to the loan check, first because it presented as genuine an indorsement about which there was enough dispute to cloud the title, rendering it nonmarketable, and second, because the provisions of G.S. 47-115.1 and this Court's decision in *O'Grady v. First Union National Bank*, 296 N.C. 212,

250 S.E. 2d 587 (1978), mandated that any indorsement of a check by one possessing a power of attorney must be done only with written authorization. As neither party had ever suggested that any disputed authorization was anything but oral, the Court of Appeals concluded this case did not involve any genuine issue of material fact and held that summary judgment for the plaintiff NCNB was properly granted by the trial court. Defendant Bank moved for discretionary review and this Court granted that motion on 1 May 1979.

Robert H. Gourley for plaintiff appellee.

William E. Crosswhite for defendant appellant Federal Reserve Bank of Richmond.

CARLTON, Justice.

The sole question for determination is whether summary judgment was properly allowed against defendant Federal Reserve Bank of Richmond (or Bank). We think the Court of Appeals erred in affirming the trial court's order and reverse.

We are confronted with the same contentions presented to the Court of Appeals. Defendant Federal Reserve Bank of Richmond argues that nothing in North Carolina law requires a written power of attorney to indorse a check for another and asserts that the question of Robbins' authority to indorse is a genuine issue of material fact which must be resolved, making summary judgment erroneous. Cf. Kessing v. National Mortgage Corporation, 278 N.C. 523, 180 S.E. 2d 823 (1971) (setting forth the standard for summary judgment).

Plaintiff NCNB argues that, regardless of the question of written or oral authority, the very existence of the alleged forgery clouds the validity of the indorsement chain, thus breaching the good title warranty of G.S. 25-4-207 and making summary judgment appropriate. It cites American National Bank of Powell v. Foodbasket, 493 P. 2d 403 (Wyo. 1972) as authority for the proposition that the definition of good title contemplated by G.S. 25-4-207 is the same concept of good title encountered in property law, that is, a marketable title free from reasonable doubt. We deal first with the assertion that a mere allegation of forgery is enough to breach the warranty of good title under G.S. 25-4-207.

*I. Warranty of Good Title under G.S. 25-4-207*

Article Four of the Uniform Commercial Code, codified in our statutes as G.S. 25-4-101 *et seq.*, contemplates a relatively simple scheme of check negotiation through commercial banking channels. A *drawer* of a check, that is one who signs it as a draft upon his own bank account at a drawee bank, G.S. 25-3-413 (2); J. White & R. Summers, *Handbook of the Law under the Uniform Commercial Code* § 13-1 at 398 (1972), makes the check out to the order of a *payee*. Here NCNB, as drawer of the check, made it out to the payee Hammond. The *drawee* of the check, that is the ultimate bank which will pay out the amount of the check and debit its drawer customer's account, in this situation was also NCNB.

The drawer of the check, the person making it out, then delivers the check in some manner to the payee. Alleged delivery here was through the purported agency of defendant Robbins. Under normal circumstances, the payee indorses the check and presents it to a bank known under Code terminology as a *depository bank*, G.S. 25-4-105(a), for money or a credit deposited to his account at that bank. The depository bank in turn begins negotiating the check through normal banking channels back to the original drawee bank by presenting the check to a collecting bank. G.S. 25-4-105(d). Over the depository bank's indorsement, the collecting bank then gives or credits the depository bank the face value of the check and takes possession of it. The collecting bank in turn indorses the check and negotiates it through another collecting bank. Eventually the check, indorsed at each step along the chain, is presented to the original drawee bank which is also known in Article Four terms as the payor bank, G.S. 25-4-105(b) and Comment (2). The drawee/payor bank pays out the value of the check to the last collecting bank, takes possession of the check and debits the account of the original drawer of the draft. Here, the drawer of the check and the eventual drawee/payor bank were the same entity, plaintiff NCNB.

Under the Uniform Commercial Code, allocation of liability for a forged indorsement along this chain of negotiation is predicated on a theory of warranty. The parties and the Court of Appeals here mistakenly rely on G.S. 25-4-207(2). Commentators make clear that the warranties embodied in G.S. 25-4-207(2) do not

run to payor banks from previous collecting banks. J. White & R. Summers, *supra* § 15-5 at 511, citing Comment 4 to G.S. 25-4-207. Here, plaintiff NCNB, as a payor bank suing a collecting bank, is in reality relying upon G.S. 25-4-207(1) which provides:

> (1) Each customer or collecting bank who obtains payment or acceptance of an item and each prior customer and collecting bank warrants to the payor bank or other payor who in good faith pays or accepts the item that
>
> (a) he has a good title to the item or is authorized to obtain payment or acceptance on behalf of one who has a good title; and
>
> (b) he has no knowledge that the signature of the maker or drawer is unauthorized. . . .

In fairness, we note the foregoing only as a technical clarification, as reliance on either G.S. 25-4-207(1) or (2) will not change the result in this case.

Any adjudicated or noncontested forgery triggers this warranty. Thus, if a payor/drawee bank suffers a loss by paying a check over a proven forged indorsement, it may sue the collecting bank which presented the check to it on a theory of breach of warranty of good title. That collecting bank in turn may sue the next collecting bank and so on down the collection chain. Final liability for the check with a forged indorsement under the Uniform Commercial Code rests ultimately on the initial depository bank which presumably could have guarded against the loss by inspecting the indorsement more closely. *Maddox v. First Westroads Bank*, 199 Neb. 81, 256 N.W. 2d 647 (1977), and cases cited therein; J. White & R. Summers, *supra* § 15-5 at 509-10 (1972); Note: Commercial Transactions — Commercial Paper — Allocation of Liability for Checks Bearing Unauthorized Indorsements and Unauthorized Drawer's Signatures, 24 Wayne L. Rev. 1077 (1978); Clarke, Bailey & Young, *Bank Deposits and Collections* 130 (4th ed. 1972) (Uniform Commercial Code Practice Handbook 3).

The Code scheme of making the initial depository bank liable on a forged indorsement parallels common law. Pre-Code cases allowed the drawee bank to obtain restitution from prior indorsers usually on the quasi-contractual theory that these prior

indorsers had been unjustly enriched by receiving money paid on a mistaken belief that an endorsement was genuine. *See, e.g., Clearfield Trust Company v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); *First National Bank v. City National Bank*, 182 Mass. 130, 65 N.E. 24 (1902); W. Britton, *Handbook of the Law of Bills and Notes* § 139 (2d ed. 1961). The Code, by relying on warranty rather than quasi-contract, adopted a minority theory, *see, e.g., Leather Manufacturers' Bank v. Merchants' Bank*, 128 U.S. 26, 9 S.Ct. 3, 32 L.Ed. 342 (1888); *Security Savings Bank v. First National Bank*, 106 F. 2d 542 (6th Cir. 1939); *Corn Exchange Bank v. Nassau Bank*, 91 N.Y. 74 (1883); *Note: Commercial Transaction, supra* at 1080-81, but preserved the general principle that liability for forged indorsements will rest on the party most able to guard against it, the party taking the instrument from the forger himself.[1]

---

1. Liability is allocated far differently when the forgery is not on an indorsement but on an actual drawer's signature on the face of the check. There are two factual variations of this situation. In the first, if the drawer's signature is forged but the check is made out to the order of a real person who indorses it, the old rule of *Price v. Neal*, 3 Burr. 1354, 97 Eng. Rep. 871 (K.B. 1762) posits liability on the drawee bank. *Accord, Woodward v. Savings & Trust Company*, 178 N.C. 184, 100 S.E. 304 (1919); *Yarborough v. Banking, Loan & Trust Company*, 142 N.C. 377, 55 S.E. 296 (1906). The Uniform Commercial Code follows the rule in *Price v. Neal*. In Article Three, G.S. 25-3-418 provides:

> Except for recovery of bank payments as provided in the article on bank deposits and collections (article 4) and except for liability for breach of warranty on presentment under the preceding section [§ 25-3-417], payment or acceptance of any instrument is final in favor of a holder in due course, or a person who has in good faith changed his position in reliance on the payment.

The commentary to this section explains:

> The section follows the rule of *Price v. Neal*, 3 Burr. 1354 (1762), under which a drawee who accepts or pays an instrument on which the signature of the drawer is forged is bound on his acceptance and cannot recover back his payment. Although the original Act is silent as to payment, the common law rule has been applied to it by all but a very few jurisdictions. The traditional justification for the result is that the drawee is in a superior position to detect a forgery because he has the maker's signature and is expected to know and compare it; a less fictional rationalization is that it is highly desirable to end the transaction on an instrument when it is paid rather than reopen and upset a series of commercial transactions at a later date when the forgery is discovered. . . .

The terms of Article Four buttress this provision. A drawee bank cannot debit its drawer customer's account for an improperly paid item, G.S. 25-4-401, of which payments of a forged check is presumably one species. And because title warranties under G.S. 25-4-207 apply only to indorsements, not signatures, White & Summers, *supra* at 510; Clarke et al, *supra* at 130, the drawee bank is left without recourse against any collecting banks which negotiated the forged check prior to presenting it to the drawee bank.

In the second factual variation of a forged signature on a check, the check is made out to a "fictitious payee," that is a person who does not exist or one whom the check signer does not intend to benefit, and such fictitious payee or anyone else indorses and negotiates the check. Liability under these circumstances rests on the drawer himself, presumably under the notion that he, rather than a depository bank, is most able to guard against making a check out to a fictitious payee. G.S. 25-3-405. *See also Perini Corporation v. First National Bank*, 553 F. 2d 398 (5th Cir. 1977); *Franklin National Bank v. Shapiro*, 7 UCC Rep. Serv. 317 (N.Y. Sup. Ct. Nassau Cty, 1970); *Modern Homes Construction Company v. Tryon Bank & Trust Company*, 266 N.C. 648, 655, 147 S.E. 2d 37 and 386, 43 (1966) (decided under Negotiable Instrument Law).

In neither of these factual variations will the initial depository bank in a chain of check negotiation be liable for losses due to forged *signatures* on the face of the check, as opposed to forged indorsements on the back of the check.

Allegation of breach of this warranty before an indorsement is proven forged, however, presents a rather different question. In the case *sub judice*, plaintiff argues that the mere allegation of forgery is enough to breach the warranty of good title, rendering any collecting bank liable on its indorsement. Plaintiff relies on an analogy to property law and asserts that a warranty of good title under the Code means a warranty of marketability or non-clouded title, as that term is understood in land transactions.

Although we agree that determination of what "good title" means under G.S. 25-4-207 is essential to deciding whether to impose liability on a collecting bank at summary judgment, we think the analogy to property law is entirely inappropriate.

The Code is silent as to what "good title" means under G.S. 25-4-207. The weight of authority, however, supports a specialized construction limiting good title to the apparent validity of the chain of indorsements.

The official commentary to G.S. 25-4-207 explains: "[T]he warranties and engagements to honor in this section are identical in substance with those provided in the Article on Commercial Paper (Article 3). . . . For a more complete explanation of the purposes of these warranties and engagements see the Comments to Sections 3-414 and 3-417."

The official commentary to G.S. 25-3-417 further provides: "[The warranty section] retains the generally accepted rule that the party who accepts or pays does not 'admit' the genuineness of indorsements, and may recover from the person presenting the instrument when they turn out to be forged."

Thus under the explanation provided by the Code framers, a warranty of "good title" means only that a collecting bank is warranting that it is presenting a check whose indorsements appear to be genuine. If in fact such indorsement is not genuine, then the collecting bank is not admitting strict liability for its breach of warranty, but can in turn sue the previous collecting bank. Courts have generally supported this construction. *See, e.g., Bagby v. Merrill, Lynch, Pierce, Fenner & Smith, Incorporated*, 491 F. 2d 192, 199 (8th Cir. 1974); *Federal Insurance Company v. Groveland State Bank*, 37 N.Y. 2d 252, 260, 333 N.E. 2d 334, 338, 372 N.Y.S. 2d 18, 24 (1975); *Insurance Company of North America v. Atlas*

*Supply Company*, 121 Ga. App. 1, 172 S.E. 2d 632 (1970); *First Pennsylvania Banking & Trust Company v. Montgomery County Bank & Trust Company*, 29 Pa. D. & C. 2d 596 (Comm. Pl. 1962); *Aetna Life and Casualty Company v. Hampton State Bank*, 497 S.W. 2d 80, 84-85 (Tex. Civ. App. 1973); Whaley, Forged Indorsements and the U.C.C.'s "Holder," 6 Ind. L. Rev. 45, 59-61 (1972).

The purpose of such a specialized construction of "good title" under the banking article of the Code has been stated to be "to speed up the collection and transfer of checks and to take the burden off each bank to meticulously check the indorsements of each item transferred." *Federal Deposit Insurance Corporation v. Marine National Bank*, 303 F. Supp. 401, 403 (M.D. Fla. 1969), *aff'd*, 431 F. 2d 341 (1970); *Sun 'N Sand, Incorporated v. United California Bank*, 21 Cal. 3d 671, 685, 582 P. 2d. 920, 930, 148 Cal. Rptr. 329, 339 (1978); Clarke et al, *supra* at 130.

A construction of good title consistent with the notion of marketable title in property law is therefore inherently inappositive to the Code's provision for the needs of a flexible banking enterprise. The only case brought to our attention which held that good title under Article Four of the Code meant marketable title as found in property law, and a case relied upon by plaintiff NCNB here, *American National Bank of Powell v. Foodbasket, supra*, was vacated by the same court that originally decided it several months after first consideration. *See American Bank of Powell v. Foodbasket*, 497 P. 2d 546 (Wyo. 1972).

The inadvisability of such a construction can be seen in the facts here. If an unproven allegation of a forged indorsement on a check is enough to make a collecting bank liable on its warranty of good title, it is entirely possible that the depository bank, the initial bank in a chain of collection, will be left liable for paying a check when in fact no forgery has occurred. For example, in this case, if we were to allow summary judgment for plaintiff NCNB based on a theory of breach of a good title warranty, defendant Federal Reserve Bank of Richmond would in turn sue the next collecting bank which had negotiated the check and so on down the line. At the end of the collection chain, the last lawsuit would presumably involve actual factual adjudication of the alleged forgery since a proven genuine indorsement would be an absolute

defense to any depository bank sued for breach of warranty under a theory of "marketable" good title. At that point, either the depository bank or the next collecting bank up the chain will have paid out the amount of the check in a summary judgment on a previous lawsuit when in fact it could not recover from either the indorsers on the check or the depository bank since the indorsement was not in fact forged. While in usual circumstances, such a bank might be able to simply renegotiate the check back to the drawee over a now-proven genuine indorsement, we are not certain such would occur here. Any attempt to renegotiate this check back to its original drawee, plaintiff NCNB, would be met with NCNB's resistance, given the stormy history of this loan agreement. It is entirely possible the depository bank would be left entangled in a needless web of lawsuits to get its money back when in fact it did nothing negligent or untoward and the real dispute is between plaintiff NCNB and its original debtor Hammond. Indeed, under both the Uniform Commercial Code and prior common law, proof of loss caused by the forged indorsement is important to indemnification, First Pennsylvania Bank, *supra*; Note: Commercial Transactions, *supra* at 1083, and cases cited therein. Here, because there has been no determination of actual default on the underlying debt, as well as no adjudication of the forgery, it may well be that plaintiff NCNB has not suffered a loss but can still recover against the original defendant, M. T., "Bill," Hammond. In such a case, it would be inappropriate to grant summary judgment for NCNB when the facts of its injury remain unresolved.

Furthermore, we believe that to permit a chain of lawsuits back to the original depository bank posited on an unproven allegation of forgery would be a grave misuse of judicial time and resources.[2]

---

2. We note in passing that the majority of other jurisdictions would allow NCNB as drawer of the check here to sue the depository bank directly and avoid the domino row of lawsuits down a collection chain. *See* Note: *Drawer v. Collecting Bank for Payment of Checks on Forged Indorsements*—Direct Suit Under the Uniform Commercial Code, 45 Temple L.Q. 102 (1971); Annot., 99 A.L.R. 2d 637 (1965).

We further note that where, unlike here, the drawer and drawee are not the same entity, the better practice for a collecting bank sued by a drawee may be to implead the original depository bank under North Carolina Rules of Civil Procedure, Rule 14(a). Furthermore, Comment 2 to G.S. 25-4-207 provides in part: "Further, the warranties and engagements run with the item with the result that a collecting bank may sue a remote prior collecting bank or a remote customer and thus avoid multiplicity of suits. Presumably, plaintiff NCNB did not take advantage of this because it was a payor, not a collecting, bank, *see*, G.S. 25-4-105(d).

[1]  We therefore hold that unproven and contested allegations of forged indorsement are insufficient as a matter of law to breach a warranty of good title under G.S. 25-4-207.

## II. Agent's Authority to Indorse a Check

[2]  Defendant Robbins in his affidavit alleged that defendant Hammond gave him an oral "power of attorney" to indorse the loan proceeds check. In affirming summary judgment for plaintiff NCNB, the Court of Appeals held that this oral authority was insufficient as a matter of law to create an agency to indorse a check, citing G.S. 47-115.1 and *O'Grady v. First Union National Bank*, 296 N.C. 212, 250 S.E. 2d 587 (1978).

A power of attorney is an instrument in writing granting power in an agent to transact business for his principal out of court. *Howard v. Boyce*, 266 N.C. 572, 146 S.E. 2d 828 (1966); 3 Am. Jur. 2d, Agency § 23 and cases cited therein. G.S. 47-115.1 codifies a particular subset of powers of attorney—those powers of attorney which may be continued in effect in the event of incapacity or mental incompetence of the principal—but does not change the requirement that written authority is necessary for a power of attorney. *Id.* at -115.1(b). *O'Grady v. Bank, supra*, involved a case where an agent, operating under a written power of attorney which limited his authority to contract for the purchase of land to one county in North Carolina, signed a note financing the purchase of land in two additional locations. Plaintiffs in that suit were the agent's principals who were attempting to avoid liability on the signed instruments in a lawsuit against the defendant bank. In stating that a defendant bank could not avail itself of the agent's apparent authority because it knew of the written power of attorney, this Court emphasized that *if* a written document granting a power of attorney existed, then all parties would be held to the terms of that document if they had constructive notice of it. *O'Grady* said nothing about the need for written authority to sign a check for a principal as a matter of agency law.

Thus, we do not think the terms of G.S. 47-115.1 or our holding in *O'Grady v. Bank, supra*, are appositive to the facts here. Although defendant Robbins termed himself holder of a "power of attorney," we believe construing the facts in a light most favorable to defendant Bank, that Robbins was in reality an

agent of defendant Hammond. With Hammond, Robbins was involved in negotiations for the loan. In Hammond's absence he delivered the signed note to the bank, took possession of the loan proceeds check, delivered the check to Hammond and generally was heavily involved in financial negotiations for Hammond and their common business interest, Energon. We should not let his mistake of fact in calling himself a holder of a "power of attorney" govern our deliberations when his version of the facts indicates he was acting as Hammond's general agent.

Nor is the fact his agency was not under a written grant of authority determinative of the question here. G.S. 25-3-403(1) provides that in the case of drafts (bank checks) and notes, "A signature may be made by an agent or other representative, and his authority to make it may be established as in other cases of representation. *No particular form of appointment is necessary to establish such authority*." (Emphasis added.)

The official commentary to this section further provides:

> The power to sign for another may be an express authority, or it may be implied in law or in fact, or it may rest merely upon apparent authority. It may be established as in other cases of representation, and when relevant parol evidence is admissible to prove or to deny it.

This proposition has long been recognized in North Carolina law. In *Midgette v. Basnight*, 173 N.C. 18, 91 S.E. 2d 353 (1917), defendant drawer of a check argued that his motion for nonsuit was improperly denied where plaintiff sued him to recover money it had paid out on an indorsed check to one whose apparent authority entitled him to indorse the check as agent for the plaintiff. The Court reasoned that indorsement on a check may be made by an agent duly authorized and that agency can be an inference from the facts presented. *Cf.* Modern Homes Construction, *supra* (discussing general agency principles in contested indorsement cases); *Nationwide Homes of Raleigh v. First-Citizens Bank & Trust Company*, 262 N.C. 79, 136 S.E. 2d 202 (1964) (discussing agency law in conjunction with drawing, not indorsing a check, but warning that a bank must ascertain the extent of the agent's authority).

The same principles apply here. If Robbins indorsed the check as real or implied agent of the defendant Hammond, then the indorsement is valid and no forgery is involved. Furthermore, under the terms of the Code, if the indorsement was initially without authority but if defendant Hammond subsequently ratified the indorsement or accepted some benefit from the money paid for the check, he could not use forgery as a defense to plaintiff NCNB's suit against him. *See* G.S. 25-3-404(2); *McKaughan v. Trust Company*, 182 N.C. 543, 109 S.E. 355 (1921) (decided under pre-Code law). Such determinations, however, involve questions of fact better left to the judgment of a jury. We therefore conclude that summary judgment was improperly granted in this case. The question whether Robbins had authority to indorse the check in question is obviously a genuine issue as to a material fact. The decision of the Court of Appeals, affirming such summary judgment is reversed, and the matter is remanded to the Court of Appeals with directions to remand this action to the Superior Court of Iredell County for further proceedings consistent with this opinion.

Reversed and remanded.

Justice COPELAND took no part in the consideration or decision of this case.