The FIDELITY BANK, Plaintiff,

v.

UNITED NATIONAL BANK OF WASHINGTON, Defendant and Third Party Plaintiff,

v.

Alonzo PRIDE, a/k/a John J. Ryan, Matthew Jackson and Ways and Means Financial Corporation, Third Party Defendants.

Civ. A. No. 83–3798.

United States District Court, District of Columbia.

July 10, 1985.

James Skelly Wright, Washington, D.C., for plaintiff.

James C. Reilly, Washington, D.C., for defendant and third party plaintiff.

Howard G. Goldberg, Baltimore, Md., for third party defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN H. PRATT, District Judge.

The plaintiff, Fidelity Bank (Fidelity) of Philadelphia instituted suit against the United National Bank (United) of Washington, D.C. for breach of warranty, claiming that United presented a check bearing forged endorsements to Fidelity, which Fidelity accepted and paid. This matter was tried without a jury on June 5, 1985.[1] Pursuant to Rule 52, Fed.R.Civ.P. the court enters the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

The essential facts of this case are not in dispute. On August 26, 1983, Fidelity executed a check drawn on itself in the amount of $74,449.69, to the order of "John J. Ryan." The check was intended as payment for certain municipal bonds ordered by a Fidelity customer and was to be delivered in exchange for the bonds to a representative of Ryan Beck & Co., a brokerage firm which was listed with Fidelity under its former name of "John J. Ryan and Company." The check was prepared by a Fidelity employee, Wilbert Thomas, pursuant to an order which listed the description of the security, the order number, the price, the broker number and broker name. It was not conclusively established at trial whether the order listed the broker's name

---

1. United filed a third-party complaint against Lorenzo Pride, a/k/a John J. Ryan, Matthew Jackson and Ways & Means Financial Corpora-tion. A judgment of default shall be entered against each of the third-party defendants.

as "John J. Ryan" or as "John J. Ryan and Company."

Thomas presented the check and order to Bruce Eskew, an authorized signatory for Fidelity, for his signature. Eskew was obligated to verify, before signing, that the name of the payee on the check precisely matched the name of the payee on the order. After being signed, the check was to have been taken to a "cage" area to be held for the broker. Whether this check was actually delivered to the cage is not established. The cage itself is a secure area but it was accessible to Thomas and other employees on a daily basis.

On September 8, 1983, the Fidelity check was presented to the defendant United by a man identifying himself as John J. Ryan. At this time, the check had already been endorsed in the name of John J. Ryan and stamped with Fidelity's "signature guaranteed" stamp. These stamps were described as being readily accessible to non-authorized employees working within the Fidelity trust department. In fact, the endorsement was a forgery and the use of the signature stamp was not authorized by Fidelity. On the recommendation of an established United customer, and based on the matching of the man's second endorsement with the already "guaranteed" initial endorsement, as well as the production of a driver's license, United opened a checking account in Ryan's name. Following its normal practice, United placed a six day freeze on the account and placed the check into the collection channels for payment. Fidelity paid the check on September 9, 1983.

Prior to the expiration of the six day hold, United received several requests from "Ryan" to release some of the frozen funds. These inquiries aroused suspicion, and Blenna Cunningham, Senior Vice President for United, attempted to investigate John J. Ryan. On September 20, 1983, she called Fidelity's bookkeeping department to inquire about John J. Ryan, explaining that Fidelity had given him a $74,000 check. The Fidelity employee responded that Fidelity had many customers named "John J. Ryan" and that she could not provide any information. Ms. Cunningham then contacted an acquaintance, Emma Chappel, of Continental Bank in Philadelphia and requested that she make inquiry at Fidelity on United's behalf. Ms. Chappel was also unable to obtain any information about Ryan from Fidelity. Thereupon, United permitted the release of substantially all of the funds, after September 20, 1983.

Fidelity representatives did not suspect that the securities had not been delivered to the bank and that the check had not been received by the brokerage firm until October 24, 1983. At that time, John Penza, the Operations Manager of the Security Clearance Unit had performed a routine check of "failed transactions," or transactions which had been incomplete for over thirty days. The transaction in question had in fact remained unsettled for nearly sixty days. Mr. Penza discovered on October 24, 1983 that the bonds had never been delivered and that the check was missing. United was notified on October 25, 1983.

## CONCLUSIONS OF LAW

Fidelity claims in this suit that United breached its presentment warranty of good title under § 4–207 of the Uniform Commercial Code (UCC), which the District of Columbia has adopted. D.C.Code § 28:4–207(1)(a). The basis of plaintiff's *prima facie* claim is that United did not have good title to the check which was presented to and paid by Fidelity because it contained unauthorized forged endorsements. United raises two defenses under the UCC sufficient to bar the plaintiff's recovery, notwithstanding the fact that United did not have good title to the instrument. We reject as inapplicable United's third defense, based on UCC § 3–405(1).

*Section 4–207(4)*

 Section 4–207(4) of the UCC provides that

[u]nless a claim for breach of warranty under this section is made within a reasonable time after the person claiming learns of the breach, the person liable is discharged to the extent of any loss caused by the delay in making the claim.

D.C.Code § 28:4–207(4). Whether notification is made within a reasonable time depends upon the particular facts of each case. *Home Indemnity v. First National Bank of Waukegan,* 659 F.2d 796, 799 (7th Cir.1981). United argues that Fidelity failed to notify it of the claim within a reasonable time because Fidelity knew or should have known when it paid the check on September 9, 1983 that the bond transaction had not been completed. We agree that Fidelity was on notice when it paid the check that the bonds had not been delivered. While Fidelity representatives did not in fact realize this until Penza checked the "failed transaction" list on October 24, 1983, had a simple verification procedure been employed United could have been notified and the funds, frozen until September 20, 1983, would not have been released. Under these circumstances, in which Fidelity failed to establish reasonable internal controls regarding its own check, we hold that the notification on October 25, 1983, was not made within a reasonable time as required by § 4–207(4).

*Section 3–406*

■ Section 3–406 of the UCC provides that

[a]ny person who by his negligence substantially contributes to ... the making of an unauthorized signature is precluded from asserting the ... lack of authority against ... a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.

D.C.Code § 28:3–406. In our view, there is no question that United paid the instrument in good faith and in accordance with reasonable banking standards. Not only did United follow its standard practice in permitting "Ryan" to open the account, but through the phone calls of Blenna Cunningham, United made good faith efforts to obtain information about him before releasing the funds. Yet Fidelity was wholly uncooperative, despite the fact that its representative was told that a $74,000 check was involved. Considering that United

contacted the one source that had knowledge of Ryan and also an interest in the subject check, and received no response, we find that the payment of the check was in accord with reasonable banking practices.

■ Conversely, even if Fidelity had notified United of the claim within a reasonable time under § 4–207(4), there were numerous instances of negligence on the part of Fidelity which, in the aggregate "substantially contribute[d] to the making of [the] unauthorized signatures." For this reason, Fidelity is barred from asserting its claim against United.

In the first instance, it is clear that the check should have been made payable to the order of "John J. Ryan and Company" or to "Ryan Beck & Co.". Whether the authorized signatory Bruce Eskew failed to compare the broker's name on the order with the payee's name on the check or whether the order itself failed to list the complete broker name, there is no question that Fidelity was negligent in permitting the check to be made payable to "John J. Ryan." This negligence increased the possibility that an unauthorized person would be able to forge the payee's name and pose as the intended payee. *See Dominion Construction, Inc. v. First National Bank of Maryland,* 271 Md. 154, 315 A.2d 69, 73 (1974).

Fidelity was also negligent in not having adequate procedures for safeguarding the check after it was signed. Not only was there no system in place to ensure that the check was actually delivered to the cage area, but employees such as Thomas had daily access to the cage. Further, the only means Fidelity had for tracing lost or stolen checks at this time was examining the "failed transaction" list, which in this case did not occur until nearly 60 days after the check had been prepared. Added to this is the fact that the Fidelity "signature guaranteed" stamp was accessible to non-authorized employees, such as Thomas, who also had access to the checks. The relative availability of this stamp surely increased the attractiveness of the stolen check to the forger. Taken together, these factors substantially increased the possibility that the check would be improperly negotiated, be-

cause it was susceptible to employee theft and there was little risk of early detection.

Finally, and perhaps most egregiously, Fidelity allowed the above negligent acts to occur despite the fact that it had very recently been required to issue a stop payment order on an earlier check written to "John J. Ryan" and prepared by Thomas. In that instance, when the broker arrived to deliver the bonds, it was discovered that the check was not in the cage. A new check was issued, but Fidelity did not institute any procedures to safeguard against the possibility of dishonest employees, nor did it investigate Thomas. Thus, not only was Fidelity negligent as already described, but it had experienced a prior similar incident that had not been cleared up, involving a check written to the same payee and prepared by the same employee.

While no single act of negligence in this case would alone constitute a bar, we find that viewed as a whole Fidelity's actions did substantially contribute to the making of the unauthorized signatures. By application of UCC § 3–406, Fidelity is precluded from asserting its claim against United.

An order consistent with the foregoing has been entered this day.