**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

WACHOVIA BANK, N.A.,
                    *Plaintiff-Appellee,*

v.

FEDERAL RESERVE BANK OF
RICHMOND,
                    *Defendant-Appellant,*

and

WAL-MART STORES, INCORPORATED,
          *Third Party Defendant.*

No. 02-1912

WACHOVIA BANK, N.A.,
                          *Plaintiff,*

v.

FEDERAL RESERVE BANK OF
RICHMOND,
                    *Defendant-Appellant,*

v.

WAL-MART STORES, INCORPORATED,
          *Third Party Defendant-Appellee.*

No. 02-2080

Appeals from the United States District Court
for the Western District of North Carolina, at Charlotte.
Lacy H. Thornburg, District Judge.
(CA-01-514-3-T)

Argued: April 4, 2003

Decided: July 29, 2003

Before NIEMEYER and SHEDD, Circuit Judges, and
Terry L. WOOTEN, United States District Judge for the
District of South Carolina, sitting by designation.

---

Affirmed by published opinion. Judge Shedd wrote the opinion, in
which Judge Niemeyer and Judge Wooten joined.

---

## COUNSEL

**ARGUED:** Glen Kirkland Hardymon, RAYBURN, COOPER &
DURHAM, P.A., Charlotte, North Carolina, for Appellant. Alan Mer-
edith Ruley, BELL, DAVIS & PITT, P.A., Winston-Salem, North
Carolina, for Appellee Wachovia; Richard D. Ballot, PITNEY,
HARDIN, KIPP & SZUCH, L.L.P., Morristown, New Jersey, for
Appellee Wal-Mart. **ON BRIEF:** Stephen D. Poe, BELL, DAVIS &
PITT, P.A., Winston-Salem, North Carolina, for Appellee Wachovia.

---

## OPINION

SHEDD, Circuit Judge:

Wachovia Bank ("Wachovia") brought an action in North Carolina
state court against the Federal Reserve Bank of Richmond ("FRB")
for breach of transfer and presentment warranties under Article 4 of
the Uniform Commercial Code ("U.C.C."), and under 12 C.F.R.
§ 210.6(b)("Regulation J"). The FRB removed the case to the United
States District Court for the Western District of North Carolina and
filed a third-party complaint against Wal-Mart Stores, Inc. ("Wal-
Mart"). The district court granted both Wachovia's and Wal-Mart's
motions for summary judgment, and the FRB appeals. For the reasons
set forth below, we affirm the judgments entered in favor of
Wachovia and Wal-Mart.

### I.

We review the grant of summary judgment *de novo*. *A.T. Massey
Coal Co., Inc. v. Massanari*, 305 F.3d 226, 235 (4th Cir. 2002). Sum-

mary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). We view the evidence in the light most favorable to the FRB. *See id.* at 255.

Wal-Mart issues 1.6 million checks to its vendors annually. In any given year, approximately twenty of these checks are stolen. Between April 1999 and April 2000, six checks were stolen from Dallas, Texas. Postal inspectors informed Wal-Mart officials that the Dallas thefts were not part of an organized scheme but were independent criminal acts. The inspectors also indicated that several individuals responsible for stealing the checks had been apprehended.

Another Wal-Mart check, written on a Wachovia checking account, was stolen from Dallas in late 2000. On November 30 of that year, Wal-Mart issued a check made payable to Alcon Laboratories, Inc. ("Alcon") in the amount of $563,288.95. Wal-Mart mailed the check from its headquarters in Arkansas to Alcon in Dallas, but Alcon never received the check. On December 7, 2000, an individual named Pit Foo Wong deposited the check in his account at Asia Bank in Flushing, New York. The payee on the check had been altered from "Alcon Laboratories, Inc." to "Pit Foo Wong."

In accordance with Federal Reserve procedures, Asia Bank presented the check to the Federal Reserve Bank of New York, which then presented the check to the FRB in Richmond. On December 8, 2000, the FRB presented the check to Wachovia, and Wachovia issued payment.[1] Before issuing payment, Wachovia employed a fraud detection service known as "Positive Pay" on Wal-Mart's account. Positive Pay allows a paying bank to verify check numbers and amounts by comparing them to checks issued by the drawer. In this way, the paying bank can detect counterfeit and unauthorized checks before making payment. Although Positive Pay prevents several types of fraud, it cannot detect alterations of payee names. Because the check presented by Wong had been altered to change the name of the payee, Positive Pay did not detect the alteration.

---

[1] A copy of the check was passed from the FRB to Wachovia at the time of presentment.

Wachovia, in accordance with its internal policy, did not manually review the copy of the check presented by the FRB.

Although the employees at Asia Bank allowed Wong to deposit the check, their suspicions were aroused by his deposit of over $500,000, and a hold was placed on the funds. At the time of deposit, Wong's account carried a balance of $108.55, and the highest balance it had ever carried was $8,652.55. On December 8, the day following Wong's deposit, Asia Bank employee Sindy Lee called Wachovia to inquire about the check. At the time of this telephone call, Wachovia had already issued payment. Lee spoke to a customer service representative, who informed Lee that the check was "good."[2] Despite this information, the branch manager at Asia Bank remained suspicious and continued to hold the funds.

On December 11, 2000, Alcon representative Penny Shaw called Wal-Mart's automated vendor support line and learned that the check to Alcon had been paid. After determining that Alcon had not received the check, Shaw called Wal-Mart employee Paula King, who handled Alcon's accounts. Although Wal-Mart's records indicated that the check had been paid, King informed Shaw that Wal-Mart's policy was to wait thirty days before tracing missing checks.

On December 20, 2000, after Asia Bank's hold on the funds had expired, Wong attempted to wire large portions of the funds to accounts in Malaysia by submitting five separate wire transfer applications to five different tellers. Because of this unusual behavior, Lee called Wachovia for a second time and was informed that the check had been paid. Shortly thereafter, another Asia Bank employee placed

---

[2]The substance of this conversation is in dispute. The district court found that Lee's version of events changed over time. At her deposition, Lee testified that she called to inquire whether the check was "good," which is often interpreted in the banking industry to mean that a check has cleared. In Lee's affidavit, however, she asserts that she also called to determine the validity of the check. In light of our determination below that post-presentment activities do not establish liability under the U.C.C., this dispute is immaterial and fails to create a question of fact that will survive summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

a call to Wal-Mart to inquire about the check. The Asia Bank employee spoke to a Wal-Mart customer service representative, Kimberly Feast, who was unable to confirm that Wong was the proper payee. At the conclusion of this telephone call, Feast did not notify her superiors of Asia Bank's inquiry. Subsequently, Asia Bank released the funds, and Wong completed his wire transfers to Malaysia.

When Wal-Mart discovered that the Alcon check had been altered, it notified Wachovia, which sought reimbursement from Asia Bank. Asia Bank refused, and Wachovia brought suit against the FRB for breach of presentment and transfer warranties under the U.C.C. and federal regulations.[3] The FRB filed a third-party complaint against Wal-Mart, alleging that Wal-Mart's failure to exercise ordinary care substantially contributed to the alteration of the check. The district court granted summary judgment in favor of both Wachovia and Wal-Mart.[4] This appeal followed.

## II.

We first address the district court's award of summary judgment to Wachovia on its claim for breach of presentment warranty under the U.C.C. Wachovia brought its claim under § 4-208 of the U.C.C., codified as N.C. Gen. Stat. § 25-4-207.1, which establishes that a bank presenting a check for payment warrants that it has not been altered. The warranty is made at the time of presentment, and the paying bank, or drawee, that pays the draft in good faith may recover damages against the presenting bank for breach of the presentment warranty. *Id.*

Through presentment warranties, the general scheme of the U.C.C. shifts losses up the collection stream to presenting and depository

---

[3]By operation of regulation, when an action is brought against the FRB for breach of presentment warranty, the FRB may recover the costs of the litigation and any damages awarded from its sender, in this case Asia Bank. *See* 12 C.F.R. § 210.5(b).

[4]The district court granted judgment to the FRB on Wachovia's claim for breach of transfer warranty. This issue, however, is not before us on appeal.

banks. *See* 2 White & Summers, *Uniform Commercial Code* § 18-7 (4th ed. 1995). This scheme is subject to certain exceptions, however, and the U.C.C. does not impose liability on presenting banks if a loss is more appropriately borne by other parties. There are several defenses available to presenting banks, two of which are relevant here. First, a presenting bank may defend a breach of warranty action on the ground that the paying bank lacked good faith. *See* N.C. Gen. Stat. § 25-4-207.1(a). The U.C.C. defines good faith as "honesty in fact and the observance of reasonable commercial standards of fair dealing." N.C. Gen. Stat. § 25-3-103(a)(4). The failure of the paying bank to exercise ordinary care is insufficient to establish a lack of good faith. N.C. Gen. Stat. § 25-4-207.1(b). Second, a presenting bank may assert a defense if the drawer of the check is precluded from asserting a claim against the paying bank. N.C. Gen. Stat. § 25-4-207.1(c). A presenting bank may avail itself of this defense if the drawer's failure to exercise ordinary care "substantially contributes to an alteration." N.C. Gen. Stat. § 25-3-406. Thus, applying this defense to the facts here, Wachovia may not recover its loss from the FRB if Wal-Mart's failure to exercise ordinary care substantially contributed to the alteration of the check.

The FRB asserts both of these defenses, alleging that Wachovia lacked good faith in paying the check and that Wal-Mart's failure to exercise ordinary care substantially contributed to the alteration. We address each of these defenses in turn.

### A.

The FRB argues that summary judgment was improperly granted for Wachovia because a question of fact exists as to whether Wachovia paid the check in good faith. In support of this argument, the FRB alleges that the two telephone calls made by Asia Bank employee Sindy Lee to Wachovia, after the payment of the check but before Asia Bank had released the funds, should have alerted Wachovia to a problem. Despite these phone calls, Wachovia failed to take any action that may have averted the ultimate loss of the funds. Wachovia's inaction, according to the FRB, demonstrates Wachovia's lack of good faith.

We conclude that the FRB's argument is foreclosed by the plain language of U.C.C. § 4-208, which provides that the presenting bank

warrants the check "at the time of presentment" to a drawee that pays in good faith. N.C. Gen. Stat. § 25-4-207.1(a). Because the statute directs us to examine the question of Wachovia's good faith *at the time of presentment*, we do not consider Wachovia's acts, or its failure to act, subsequent to presentment. While the FRB may be correct in its assertion that Lee's telephone calls should have prompted Wachovia to investigate the check, these calls occurred after the check was presented and paid. We conclude, therefore, that the FRB cannot establish a defense to the warranty action based upon Wachovia's post-presentment activities.

The FRB also argues that Wachovia failed to act in good faith by failing to supplement the Positive Pay system, which does not detect alterations of payee names, with a manual review of high-dollar checks. Because Wachovia, or any bank, must process a check prior to issuing payment on it, Wachovia's processing procedures are relevant to its good faith in paying the check at issue here. We must therefore consider whether Wachovia's failure to review checks manually creates a question of good faith that survives summary judgment.

The U.C.C. defines "good faith" as (1) "honesty in fact" and (2) "the observance of reasonable commercial standards of fair dealing." § 25-3-103(a)(4). As to the second prong of the good faith test, the question is not whether a bank acted in accordance with "reasonable commercial standards," but whether the bank's actions conformed to "reasonable commercial standards *of fair dealing*." White & Summers, *supra*, § 17-6 (4th ed. 1995). To determine whether Wachovia acted in conformity with reasonable commercial standards of fair dealing, we consider the fairness of Wachovia's actions, rather than any negligence on its part.

The FRB has not come forward with evidence demonstrating that Wachovia's failure to review high-dollar checks manually was not honest in fact or did not conform to reasonable commercial standards of fair dealing. While the FRB does allege that Wachovia's check-processing procedures did not conform to reasonable commercial standards, the FRB has not made a showing that Wachovia failed to comply with reasonable commercial standards *of fair dealing*. This distinction is critical. In order to survive summary judgment, the FRB must point to evidence in the record indicating that Wachovia acted

in an unfair or dishonest manner, rather than in a negligent manner. Because the FRB has not demonstrated that a question of material fact exists as to Wachovia's honesty or fair dealing, the FRB cannot prevail on its defense that Wachovia lacked good faith in paying the check.[5]

B.

We next consider the FRB's argument that summary judgment was improperly granted to Wachovia because a question of fact exists regarding the purported negligence of the drawer Wal-Mart. The U.C.C. provides that the FRB may assert a defense to Wachovia's warranty action if Wal-Mart's failure to exercise ordinary care "substantially contributes" to the alteration. N.C. Gen. Stat. § 25-3-406.

---

[5]In making the argument to the district court that Wachovia failed to act in good faith because it did not manually review the check, the FRB offered the affidavit of Barbara Ann Tosi, the president of a banking industry consulting firm. According to Tosi, a review of the check would have revealed that the name of the payee had been highlighted and printed in a different font size from the rest of the check, both of which are inconsistent with the format of Wal-Mart checks. The district court, without explanation, declined to consider the Tosi affidavit. While it is not clear why the district court did not consider the affidavit, we have examined it and conclude that it fails to create an issue of fact as to whether Wachovia acted in good faith. In her affidavit, Tosi asserts that Wachovia's activities were insufficient as fraud protection. Her analysis, however, is one of negligence, not of fairness. To the extent that her affidavit could be construed as asserting the appropriate standard of good faith under the U.C.C., it is unsupported by any evidence, amounting to nothing more than a legal conclusion that carries no weight for purposes of summary judgment. *See Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 962 (4th Cir. 1996).

Even though the correct analysis is one of fairness, rather than negligence, Wachovia's check-processing procedures cannot even be characterized as negligent. Under the U.C.C., a bank does not violate ordinary care if it processes instruments by automated means without examining the instruments, unless such a practice violates the bank's prescribed procedures, the bank's procedures vary unreasonably from general banking usage, or the bank's procedures are otherwise prohibited by the U.C.C. *See* N.C. Gen. Stat. § 25-3-103(a)(7). There is simply no evidence that Wachovia has violated this section.

The FRB argues that Wal-Mart, in electing not to implement precautionary measures for checks mailed to the Dallas area, failed to exercise ordinary care that substantially contributed to the alteration of the check. Specifically, the FRB maintains that Wal-Mart should have utilized Electronic Funds Transfer ("EFT") to pay vendors in Dallas or used an overnight courier such as Federal Express. The FRB also maintains that Wal-Mart should have shortened the standard 30-day period for tracing missing checks sent to the Dallas area and, at the very least, should have alerted its customer service representatives to be on the lookout for suspicious checks sent there.

We conclude, based upon the facts presented, that Wal-Mart's failure to implement the FRB's suggested methods of payment did not "substantially contribute" to the alteration. While it is true that a relatively high percentage of stolen checks were taken from Dallas between April 1999 and April 2000, the six checks stolen from Dallas constituted a very small percentage of the 1.6 million checks issued annually by Wal-Mart. The check at issue here was stolen in December 2000, and a check had not been stolen from Dallas since April of that year. Moreover, postal inspectors informed Wal-Mart employees that there was no organized effort to steal Wal-Mart checks in the Dallas area and that several individuals responsible for previous thefts had been apprehended. Given these circumstances, Wal-Mart's failure to send payment via EFT or Federal Express did not constitute a failure to exercise ordinary care, much less a failure to exercise ordinary care that substantially contributed to the alteration.[6]

Furthermore, it cannot be said that had Wal-Mart instructed its customer service representatives to pay particular attention to suspicious checks from Dallas, or had Wal-Mart shortened the 30-day tracing period, the alteration to the check at issue here would have been prevented. At the time Wal-Mart received the inquiries from both Alcon

---

[6]The FRB's argument that Wal-Mart should have used EFT is particularly unconvincing given that the issue here requires an interpretation of statutes governing the use of commercial paper. The FRB's argument can thus be reduced to the proposition that to avoid liability in the context of commercial paper, Wachovia should have refrained from using commercial paper. This result, of course, would result in an absurdity, and we decline to so hold.

and Asia Bank, the check had already been altered. Therefore, Wal-Mart's failure to implement these procedures could not have contributed to this particular alteration.[7]

The FRB also urges us to consider the alleged negligence of Wal-Mart employees Paula King and Kimberly Feast subsequent to the alteration. In particular, the FRB notes that King already knew that the check was missing when an Asia Bank employee spoke to Feast regarding the check. According to the FRB, Wal-Mart was in possession of information that it should have used to prevent the ultimate loss. While it may well be that Wal-Mart's failure to act on the information made available to King and Feast constituted less than prudent behavior, which could perhaps be characterized as negligence, the unambiguous terms of the statute provide a defense to the FRB only if Wal-Mart's negligence substantially contributed to the alteration. *See* N.C. Gen. Stat. § 25-3-406. Because Paula King and Kimberly Feast were both informed of problems with the check *after* the alteration was made, Wal-Mart's failure to act could not have contributed to the alteration. We therefore conclude that the FRB cannot establish a defense to the warranty claim based upon the asserted post-alteration negligence of Wal-Mart.[8]

---

[7]The FRB relies heavily on *Fidelity Bank v. United National Bank of Washington*, 630 F.Supp. 16 (D.D.C. 1985), in support of its argument that Wal-Mart's negligence substantially contributed to the alteration. There, after issuing a stop payment order on a missing check made out to John J. Ryan, Fidelity again drew a check on itself to the order of John J. Ryan. At the time the second check was drawn, the problems associated with the first check had not been resolved. The second check was subsequently forged and presented to United Bank by a man identifying himself as John J. Ryan. The court held that Fidelity's breach of warranty claim against United was barred by § 3-406 because Fidelity's negligence substantially contributed to the making of the forged signature. In our view, Wal-Mart's behavior prior to the alteration is not analogous to Fidelity's acts that contributed to the forgery. Wal-Mart was not confronted with the wholly unexplained loss of a check. To the contrary, Wal-Mart officials were led to believe that the series of thefts in Dallas were perpetrated by independent criminal actors and that several individuals had been apprehended.

[8]The FRB further argues that Wal-Mart's failure to act should be viewed in light of "Regulation CC," which strictly limits the time period

Because we find that the FRB cannot establish a defense to Wachovia's warranty action based upon Wal-Mart's purported negligence, we conclude that the grant of summary judgment in favor of Wachovia was proper.[9]

### III.

We briefly address the FRB's third-party complaint against Wal-Mart based upon U.C.C. § 3-406. *See* N.C. Gen. Stat. § 25-3-406. We note that this statute provides for a defense but does not expressly create a cause of action. To the extent that such a cause of action is cognizable, which we do not hold, we conclude that summary judgment for Wal-Mart was properly granted. As we have discussed, the FRB is unable to demonstrate that the asserted negligence of Wal-Mart substantially contributed to the alteration of the check. Therefore, the FRB's claim must fail.

### IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

---

during which a bank can hold funds after deposit. *See* 12 C.F.R. § 229. While Asia Bank was indeed faced with the unenviable choice of complying with a federal regulation or exercising caution in the face of suspicious circumstances, this question is ultimately irrelevant. Asia Bank subjected itself to the requirements of Regulation CC when it permitted Wong to deposit the check. Asia Bank also warranted that the check had not been altered when it presented the check to Wachovia for payment. The FRB's liability, and ultimately, Asia Bank's liability, is entirely consistent with the general scheme established by the U.C.C., which seeks to shift losses upstream to presenting and depository banks. *See* White & Summers, *supra*, § 18-7 (4th ed. 1995); *see also supra*, § 19-3.

[9]We also conclude, for the reasons that we have set forth in our analysis under the U.C.C., that the district court properly granted summary judgment in favor of Wachovia on its breach of presentment warranty claim under Regulation J. *See* 12 C.F.R. § 210.6(b). Because we have determined that any negligence on Wal-Mart's part did not substantially contribute to the alteration of the check, we need not address the FRB's argument that, under Regulation J, it may offset Wachovia's claim due to Wal-Mart's negligence.