Leiber v. Arboretum Joint Venture, LLC, 2009 NCBC 16.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| COUNTY OF  MECKLENBURG | 05 CVS 1875 |

HILMAR LEIBER,

        Plaintiff,

   v.

ARBORETUM JOINT VENTURE,
LLC, AAC-ARBORETUM JOINT
VENTURE CONSOLIDATED
LIMITED PARTNERSHIP, AAC-
FRANKLIN SQUARE LIMITED
PARTNERSHIP, FRANKLIN III
LIMITED PARTNERSHIP, AAC-
FRANKLIN DEVELOPMENT GP
LIMITED PARTNERSHIP, AAC-
FRANKLIN DEVELOPMENT, INC.,
FRANKLIN SQUARE IV, LLC,
SOUTHLAKE LIMITED
PARTNERSHIP, AAC RETAIL
PROPERTY DEVELOPMENT AND
ACQUISITION FUND, LLC, AAC
RETAIL FUND MANAGEMENT,
LLC, AMERICAN ASSET
CORPORATION COMPANIES,
LTD., AAC INVESTMENTS, INC.,
GASTONIA LIMITED
PARTNERSHIP, ARBOR LIMITED
PARTNERSHIP, BANK OF
AMERICA and WACHOVIA BANK,

        Defendants.

ORDER & OPINION

{1}    THIS MATTER is before the Court on Defendant Wachovia Bank N.A.'s

Motion for Summary Judgment, Defendant Bank of America, N.A.'s Motion for

Summary Judgment, and the AAC Defendants'[1] Motion for Summary Judgment.

*Bishop, Capitano & Moss, P.A. by J. Daniel Bishop for Plaintiff.*

*Robinson Bradshaw & Hinson, P.A. by Douglas M. Jarrell and B. Chad Ewing for Defendant Wachovia Bank, N.A.*

*Driscoll Sheedy, P.A. by James W. Sheedy and Susan E. Driscoll for Defendant Bank of America, N.A.*

*K&L Gates, LLP by Kiran H. Mehta and Samuel T. Reaves for Arboretum Joint Ventures, LLC, AAC-Arboretum Joint Venture Consolidated Limited Partnership, AAC-Franklin Square Limited Partnership, Franklin III Limited Partnership, AAC-Franklin Development GP Limited Partnership, AAC-Franklin Development, Inc., Franklin Square IV, LLC, Southlake Limited Partnership, AAC Retail Property Development and Acquisition Fund, LLC, AAC Retail Fund Management, LLC, American Asset Corporation Companies, Ltd., and AAC Investments, Inc.*

Tennille, Judge.

## I.

## PROCEDURAL BACKGROUND

{2}    This action was filed in Mecklenburg County Superior Court on October 19, 2005.  The matter was designated an exceptional civil case pursuant to Rule 2.1 of the General Rules of Practice for the Superior and District Courts and was assigned to the undersigned Special Superior Court Judge for Complex Business Cases by Order of the Chief Justice of the Supreme Court of North Carolina dated July 17, 2006.  Plaintiff filed the First Amended Complaint on April 20, 2007.

---

[1] The "AAC Defendants" consist of the following defendants:  Arboretum Joint Ventures, LLC, AAC-Arboretum Joint Venture Consolidated Limited Partnership, AAC-Franklin Square Limited Partnership, Franklin III Limited Partnership, AAC-Franklin Development GP Limited Partnership, AAC-Franklin Development, Inc., Franklin Square IV, LLC, Southlake Limited Partnership,  AAC Retail Property Development and Acquisition Fund, LLC, AAC Retail Fund Management, LLC, American Asset Corporation Companies, Ltd., and AAC Investments, Inc.

{3}    All Defendants have filed motions for summary judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure.  The Court heard oral arguments on the motions on June 13, 2008.

## II.
## FACTUAL BACKGROUND
### A.
### THE PARTIES

{4}    Plaintiff Hilmar Leiber ("Leiber") is a citizen of Germany.

{5}    Defendant Arboretum Joint Venture LLC ("Arboretum JV LLC") is a North Carolina limited liability company headquartered in Mecklenburg County, North Carolina.  Arboretum JV LLC is successor to Arboretum Joint Venture, formerly a North Carolina general partnership, by cross-entity conversion effective July 1, 2003.  Arboretum Joint Venture, in turn, was successor to AAC-Arboretum Joint Venture #1 Limited Partnership, AAC-Arboretum Joint Venture #2 Limited Partnership, and AAC-Arboretum Joint Venture #3 Limited Partnership, all formerly North Carolina limited partnerships, by mergers effective July 1, 2003.

{6}    Defendant AAC-Arboretum Joint Venture Consolidated Limited Partnership ("Arboretum Consolidated") is a North Carolina limited partnership, cancelled of record August 5, 2002.  Prior to its cancellation, it maintained its headquarters in Mecklenburg County, North Carolina.

{7}    Defendant AAC-Franklin Square Limited Partnership ("Franklin Square LP") is a North Carolina limited partnership, cancelled of record effective August 10, 2004.  Prior to its cancellation, it maintained its headquarters in Mecklenburg County, North Carolina.

{8}    Defendant Franklin III Limited Partnership ("Franklin III LP") is a North Carolina limited partnership, cancelled of record effective December 27, 2002.  Prior to its cancellation, it maintained its headquarters in Mecklenburg County, North Carolina.

{9}     Defendant AAC-Franklin Development GP Limited Partnership ("Franklin Development LP") is a North Carolina limited partnership, cancelled of record effective December 27, 2002.  Prior to its cancellation, it maintained its headquarters in Mecklenburg County, North Carolina.  Franklin Development LP was general partner of Franklin III Limited Partnership.

{10}    Defendant AAC-Franklin Development, Inc. is a North Carolina corporation, dissolved December 27, 2002.  Prior to its dissolution, it maintained its headquarters in New York.  AAC-Franklin Development, Inc. was general partner of Franklin Development LP.

{11}    Defendant Franklin Square IV, LLC ("Franklin Square IV") is a North Carolina limited liability company, administratively dissolved November 5, 2001.  Prior to its dissolution, it maintained its headquarters in Mecklenburg County, North Carolina.

{12}    Defendant Southlake Limited Partnership ("Southlake") is a North Carolina limited partnership, cancelled of record effective March 31, 2003.  Prior to its cancellation, it maintained its headquarters in Mecklenburg County, North Carolina.

{13}    Defendant AAC Retail Property Development and Acquisition Fund, LLC ("AAC Retail Fund") is a Delaware limited liability company headquartered in New York and qualified to conduct business in North Carolina, with its registered agent in Mecklenburg County, North Carolina.

{14}    Defendant AAC Retail Fund Management, LLC ("Retail Fund Management") is a Delaware limited liability company headquartered in New York and qualified to conduct business in North Carolina, with its registered agent in Mecklenburg County, North Carolina.  Retail Fund Management is manager of Defendant AAC Retail Fund.

{15}    Defendant American Asset Corporation Companies, Ltd. ("AAC Cos.") is a Delaware corporation headquartered in New York and qualified to conduct business in North Carolina, with its registered agent in Mecklenburg County, North Carolina.  AAC Cos. is manager of Defendant Retail Fund Management.

{16} Defendant AAC Investments, Inc. ("AAC Investments") is a Delaware corporation formerly known as American Asset Corporation, headquartered in New York and qualified to conduct business in North Carolina, with its registered agent in Mecklenburg County, North Carolina.

{17} Defendant Gastonia Limited Partnership ("Gastonia") is a North Carolina limited partnership, cancelled of record February 25, 2004. Prior to its cancellation, it maintained its headquarters in Mecklenburg County, North Carolina.

{18} Defendant Arbor Limited Partnership ("Arbor") is a North Carolina limited partnership, cancelled of record February 25, 2004. Prior to its cancellation, it maintained its headquarters in Mecklenburg County, North Carolina.

{19} The parties listed in Paragraphs 5 to 18 will be collectively referred to as the "AAC Defendants" or the "AAC entities."

{20} Defendant Bank of America, N.A. ("B of A"), is a national banking association headquartered in Mecklenburg County, North Carolina.

{21} Defendant Wachovia Bank, N.A. ("Wachovia"), was a national banking association headquartered in Mecklenburg County, North Carolina.

{22} The parties listed in Paragraphs 20 and 21 will be collectively referred to as "the Banks" or "the Bank Defendants."

B.

UNDISPUTED FACTS

1.

THE RELATIONSHIP BETWEEN THE PARTIES

{23} Leiber is a German national currently residing in Germany. Leiber, who goes by "Dr. Hilmar Leiber," is a practicing attorney. Since passing the German bar exam in 1969, Leiber has provided investment and tax advice to his clients. As a result of his formal education and his professional experience, Leiber is a seasoned investor.

{24} In the late 1980s or the early 1990s, Leiber was introduced by a friend, Dr. Kunstmann, to Wolfram Count von Spreti ("Spreti"). Dr. Kunstmann informed Leiber that Spreti had successfully invested money in the United States. Without

any research or due diligence into Spreti or Spreti's investments, Leiber recommended that one of his clients, Caroline Becher, invest with Spreti. After Ms. Becher invested with Spreti, Spreti personally invited Leiber to invest with him in the United States.

{25} Spreti invested in the AAC Defendants, a collection of entities that were founded in Charlotte, North Carolina, beginning in the late 1980s. The AAC Defendants primarily develop commercial real estate.

{26} Riprand Count Arco ("Count Arco") and Maria Beatrice Countess Arco ("Countess Arco"), both of whom are German, run the AAC Defendants. Spreti was a social contact of Count and Countess Arco, and they invited him to invest with them in the United States. At no point prior to meeting Spreti did Leiber have any contact with any of the AAC Defendants.

2.

LEIBER'S INVESTMENT

{27} Shortly after Spreti's invitation to invest in the United States, Leiber wire-transferred $210,000 from a Swiss bank account to be invested directly in Southlake, an AAC Defendant. The parties dispute whether Leiber was Spreti's "client" or whether Spreti "invested" Leiber's money. Leiber contends that Spreti was merely a "mediator" between Leiber and the AAC Defendants and that the $210,000 was wired directly to a bank account controlled by the AAC Defendants, not by Spreti. Conversely, the AAC Defendants contend that Leiber was Spreti's "client" and that Spreti "invested" Leiber's money in Southlake. On the facts of this case, the Court finds this distinction to be of little consequence. Whether Leiber was Spreti's client or whether Spreti invested the funds is a matter of semantics. It is undisputed that $210,000 was transferred from Leiber's Swiss bank account based upon Spreti's advice.

{28} Significantly, there is no evidence that Leiber did any due diligence with respect to his investments in the AAC Defendants. Certainly, he obtained no information directly from the AAC Defendants. Nor is there any evidence he

obtained information from the Arcos.  The only source of information upon whom he could have relied was Spreti.

{29}   Leiber also invested in Arbor and Gastonia, both AAC Defendants.  Arbor and Gastonia were both partnerships that held limited partnership interests in other AAC entities.  Spreti was the general partner of both Arbor and Gastonia.  In total, Leiber invested $445,000 in the AAC Defendants. (Leiber Dep. 112:4−8, Oct. 26, 2006.)

3.

LEIBER'S INVESTMENT DOCUMENTS

{30}   Leiber executed a number of documents for his investments in Southlake, Arbor, and Gastonia.  For Southlake, Leiber signed three (3) attachments to the Southlake Limited Partnership Agreement, including a Subscription Agreement, a Signature Page, and a Power of Attorney.  Leiber also signed a partnership agreement for both Arbor and Gastonia.  The parties have, however, failed to produce an executed copy of the Gastonia agreement.

{31}   All of the documents Leiber signed were in English.  The parties dispute whether Leiber, who does not speak or read English, signed the documents "on the advice of Spreti."  (AAC Defs.' Br. Supp. Mot. Summ. J. 5; Pl.'s Resp. Mot. Summ. J. 5.)   The dispute over semantics notwithstanding, it is undisputed that: (1) Leiber testified his only contact was with Spreti; (2) he knows of nowhere else from which the documents could have come; (3) he did not read the documents or have them translated before signing; (4) he signed at least one document when Spreti came to visit him; and (5) he signed at least one document because he "trusted"[2] Spreti.

{32}   The Signature Page of the Southlake Limited Partnership Agreement contained an "Address of Notices" field.  On the Signature Page executed by Leiber, the "Address of Notices" field contained the following hand-printed words: "Att. Mr. Peter Emgler, Wirtschafts & Privat Bank, Stauffacher Str. 45, 8026 Zurich,

---

[2] Leiber explained he signed the documents presented to him by Spreti without reading them or having them translated, "[b]ecause I had trust—I trusted I could make an investment via Graf Spreti in America."  (Leiber Dep. 70:17−18.)

Switzerland." Shortly thereafter, however, Spreti instructed the AAC Defendants to send all information concerning Leiber's investments directly to Spreti in Germany. The AAC Defendants complied with Spreti's request despite the hand-printed address on the Southlake Signature Page. From then forward, the AAC Defendants sent everything related to Leiber's investments, including payments, to Spreti.

{33} Plaintiff's counsel has suggested that Leiber intended payments be sent to Mr. Emgler at Wirtschafts & Privat Bank. Leiber's deposition testimony makes clear, however, that Leiber never intended payments be directed to Mr. Emgler.[3] In fact, Leiber testified that he did not write the Swiss bank's address on the Signature Page or know who did.[4] The evidence before the Court indicates that Leiber had no agreement with either the AAC entities or Spreti about how he would receive communications or disbursements related to his investments in the United States.[5]

{34} Consistent with Spreti's instructions, the AAC entities sent all distributions and documentation related to Leiber's investments to Spreti. The

---

[3] Q: Did you ask [Spreti] to send anything to your bank accounts in Switzerland?
 A: Originally I had intended to have the management of the investment done by a Swiss instance, but then I decided against it.
 Q: Why?
 A: Because the supervision of the investment or the control of the investment by—in Switzerland was not orderly enough for my taste.

(Leiber Dep. 76:24–77:10.)

[4] Q: On the [Signature Page], which is marked page 1, Bates-stamped LBR 01527, is anything on here in your handwriting?
 A: No.
 Q: Do you know whose handwriting that is?
 A: No. It's in printed letters that are almost impossible to identify.
 Q: But you know it's not yours?
 A: Yes.

(Leiber Dep. 71:21–72:4.)

[5] Q: Did you expect the checks to be delivered to Count Spreti?
 A: There was no agreement in that respect.

(Leiber Dep. 76:15–18.)

record indicates distributions intended for Leiber totaling approximately $315,000 from 1990 to 2003. Many of the distributions were by way of check made payable to "Wolfram Spreti In Favor of Dr. Hilmar Leiber." (Briody Dep. 189:8–190:6, June 30, 2006.) Moreover, the AAC entities also completed United States and North Carolina tax returns for Leiber's investments. From 1990 to 2003, the tax returns claimed refunds totaling approximately $78,000. The AAC entities claim to have sent the tax refund checks for Leiber's investments to Spreti.

{35} The record also indicates that, during the period from 1990 to 2003, Leiber received only approximately $75,000 from Spreti, leaving roughly $320,000 unaccounted for. Leiber testified that he received his first disbursement from Spreti eighteen months after his initial investment.[6] Over the fifteen years at issue, Leiber claims that he received approximately twenty total payments from Spreti.[7] Leiber knew the checks made out to him from the AAC Defendants were being sent to Spreti, but he never objected to anyone, including Spreti or the AAC Defendants, about this practice.[8] In fact, Leiber didn't contact any of the AAC Defendants concerning his investments until 2005, even though he had their contact information in 2000. On each and every occasion, Leiber failed to object to Spreti receiving the payments on his behalf.

---

[6] Q: When did you begin receiving disbursements of income from your investments with Count Spreti?
 A: I received the first disbursements approximately 18 months after signing.

(Leiber Dep. 74:19–22.)

[7] Q: To the best of your recollection, how many disbursement checks did you receive personally from your investment in America?
 A: Within 15 years, it's kind of difficult to say, but I'd say plus, minus, within—that there were probably 20 transfers within that period of time.

(Leiber Dep. 122:10–15.)

[8] Q: You never objected to the checks being delivered to Count Spreti, though?
 A: No.

(Leiber Dep. 76:15–20.)

{36} The record indicates that Leiber did a poor job of managing his investments in the AAC Defendants. Only rarely did Leiber and Spreti discuss Leiber's investments. On one occasion in 2000, Spreti sent Leiber a letter stating that he was enclosing a disbursement check from the AAC Defendants. The letter, however, did not contain the disbursement check. In light of the missing check, Leiber's wife sent Spreti a letter requesting that Spreti call her about the missing check and send a new one. Nevertheless, Leiber never received the missing check or followed up with Spreti regarding the missing check.

4.

REDEMPTION OF THE SOUTHLAKE INTEREST

{37} In July 2000, the AAC entities created the AAC Retail Fund. It was created to consolidate the AAC entities' interests in several commercial properties into one entity to facilitate an increased borrowing limit.

{38} Southlake was contributed to the AAC Retail Fund in 2002. Investors in Southlake were given the opportunity to roll their Southlake investment into the AAC Retail Fund or sell their Southlake investment to the AAC Retail Fund. In accordance with Spreti's earlier instructions, the AAC entities mailed Leiber's election form to Spreti. Spreti completed the election form, thereby notifying the AAC entities that Leiber wished to sell his interest in Southlake to the AAC Retail Fund. Accordingly, the AAC entities sent a Transfer and Sale of Limited Partnership Interest in Southlake Limited Partnership ("Southlake Redemption Agreement") to Spreti.

{39} Subsequently, the AAC entities received the Southlake Redemption Agreement from Spreti with what was purported to be Leiber's signature. As a result of the signed Southlake Redemption Agreement, the AAC Retail Fund issued a Wachovia Bank check (the "Wachovia Check") payable to Leiber in the amount of $151,274. The Wachovia Check represented the purchase price of Leiber's interest in Southlake less amounts withheld for United States taxes.

{40} Leiber alleges that Spreti forged Leiber's indorsement on the Wachovia Check, cashed it and retained the proceeds. (First Am. Compl. ¶ 41.) Spreti

cashed the Wachovia Check at Dresdner Bank, AG ("Dresdner"), a German bank. Dresdner then transferred the Wachovia Check to American Express Bank ("AMEX") for collection. Subsequently, AMEX presented the Wachovia Check to Wachovia for payment, and Wachovia paid in full.

5.

REDEMPTION OF THE ARBOR AND GASTONIA INTERESTS

{41}   A similar scenario resulted from Leiber's interests in Arbor and Gastonia. Arbor and Gastonia were both contributed to the AAC Retail Fund in January 2001. In 2003, the AAC entities again sent investors documents permitting their interests in Arbor and Gastonia to be rolled into the AAC Retail Fund or sold to the AAC Retail Fund. Specifically, the AAC entities sent Spreti a Membership Interest Redemption Agreement Between Arbor Limited Partnership and Hilmar Leiber ("Arbor Redemption Agreement") and a Member Interest Redemption Agreement Between Gastonia Limited Partnership and Hilmar Leiber ("Gastonia Redemption Agreement"). Here again, the AAC entities received the Arbor Redemption Agreement and the Gastonia Redemption Agreement with what was purported to be Leiber's signature. As a result of the signed agreements, the AAC Retail Fund issued a Bank of America check (the "B of A Check") payable to Leiber in the amount of $254,858. The B of A Check represented the purchase price of Leiber's interest in both Arbor and Gastonia less amounts withheld for United States taxes.

{42}   Leiber again alleges that Spreti forged Leiber's indorsement on the B of A Check, cashed it and retained the proceeds. (First Am. Comp. ¶ 44.) Spreti negotiated the B of A Check at Oberbank, AG ("Oberbank"). Oberbank transferred the B of A Check to Wachovia for collection. Thereafter, Wachovia presented the check to B of A for payment, and B of A paid in full.

{43}   The Wachovia Check and the B of A Check will be collectively referred to as "the Checks" or the "Redemption Checks."

6.

## SPRETI COMMITS SUICIDE

{44} In November 2004, Leiber scheduled a meeting with Spreti to discuss his investments in the United States. The day before the scheduled meeting, Spreti committed suicide. It was not until after Spreti's death that Lieber claims to have learned about the Wachovia and B of A Checks that were purportedly payment for his interests in Southlake, Arbor, and Gastonia.

{45} In May 2005, Leiber demanded payment from the AAC Defendants for the amounts Spreti allegedly misappropriated. To date, Leiber has not taken any legal action against Spreti's estate or contacted German officials about Spreti's alleged misconduct. Furthermore, Leiber has not taken any legal action against the European banks at which the Wachovia Check and B of A Check were negotiated.

7.

## ALTERNATIVE CLAIMS

{46} Leiber filed this instant litigation on October 19, 2005. Plaintiff asserts alternative claims against the AAC Defendants and the Bank Defendants. The alternative liability turns on the issue of agency.

{47} On one hand, Paragraph 47 of the First Amended Complaint asserts:

> Spreti was *not* authorized to act as agent for Leiber or, upon information and belief, other limited partners of Arbor or Gastonia in executing or carrying out the Arbor, Gastonia, [or Southlake] Redemption Agreements or receiving payments issued in the limited partners' names. The payments delivered into Spreti's possession were not delivered to Leiber and such other limited partners.

(First Am. Compl. ¶ 47 (emphasis added).) Additionally, the First Amended Complaint avers that Spreti "was *not* authorized upon information and belief to receive" the Redemption Checks from the AAC Defendants. (First Am. Compl. ¶¶ 59, 61 (emphasis added).)

{48} On the other hand, Paragraph 83 of the First Amended Complaint states that "Spreti acted as [Leiber's] duly or apparently authorized agent in the receipt of the B of A Check or that Leiber constructively received the B of A Check." (First

Am. Compl. ¶ 83.) Along those same lines, Paragraph 87 of the Amended Complaint asserts that "Spreti acted as [Leiber's] duly or apparently authorized agent in the receipt of the Wachovia Check or that Leiber constructively received the Wachovia Check." (First Am. Comp. ¶ 87.) Ultimately, the disposition of this case will turn on the issue of agency. If there is sufficient evidence to establish that Spreti was Leiber's agent with respect to Leiber's investment in the United States, the AAC Defendants are entitled to summary judgment and the Bank Defendants are not entitled to summary judgment.[9]

8.

REQUESTS FOR ADMISSION AND INTERROGATORIES

{49} Wachovia has served several sets of requests for admission and interrogatories in this case. The Second Set of Requests for Admission and the Second Set of Interrogatories were served after fact discovery was completed. The discovery sought to resolve Plaintiff's conflicting positions that (1) Spreti *was* Leiber's agent for purposes of receipt of the Wachovia and B of A Checks and that (2) Spreti *was not* Leiber's agent for purposes of receipt of the Wachovia and B of A Checks.

{50} Plaintiff objected to the discovery requests by asserting, among other things, that "[w]hether Spreti was Leiber's agent is a bona fide controversy." (Pl.'s Resp. Wachovia Bank's First Set Req. Admis. 2.) Plaintiff did, however, give a limited substantive response by admitting that he did not communicate *express* authority for Spreti to receive the Wachovia Check or the B of A Check. (Pl.'s Resp. Wachovia Bank's First Set Req. Admis. 2.)

{51} Wachovia subsequently advised Plaintiff that the responses to the discovery did not comply with Rule 36 of the North Carolina Rules of Civil Procedure. On March 16, 2007, Wachovia filed its Motion to Determine Sufficiency of Plaintiff's Response to Requests for Admission and to Compel Plaintiff to Respond to Interrogatories (the "Motion to Compel"). In an Order dated April 18,

---

[9] Leiber has straddled the fence on the question of Spreti's agency. Accordingly, he could not and did not move for summary judgment with respect to his claims against the Banks. Those claims remain for trial.

2007, the Court granted Wachovia's Motion to Compel. The Court stated, "[f]act discovery is closed. Leiber either authorized Spreti to receive the checks or he did not. He will have to answer that fact question at trial. He should do so now." (Order Mot. Compel 2.)

{52} In response to the Court's April 18th Order, Plaintiff filed supplemental responses to the Requests for Admission. Leiber's supplemental responses to Requests for Admission numbers 1 and 2 are as follows:

> 1. Wolfram Count von Spreti was not authorized to receive the Wachovia Check, as that term is used in the Complaint, on Leiber's behalf from the AAC Retail Fund or any person or entity.

> RESPONSE:
> Leiber admits that he did not communicate to any person or entity express authority for Spreti to receive the Wachovia Check, either specifically or by a more general communication of authority. Except as expressly admitted, denied.

> 2. Plaintiff Hilmar Leiber did not receive delivery of the Wachovia Check, as that term is used in the Complaint, either directly or through delivery to an agent or co-payee, prior to the date upon which Wolfram Count von Spreti allegedly deposited the Wachovia Check.

> RESPONSE:
> Leiber admits that he did not receive direct delivery of the Wachovia Check and that there was no co-payee on the check. Except as expressly admitted, denied.

(Pl.'s Supp. Resp. Wachovia Bank's First & Second Set Req. Admis. 1–2.) Leiber gave virtually identical supplement responses to Requests for Admission numbers 3 and 4 regarding the B of A Check. (*See* Pl.'s Supp. Resp. Wachovia Bank's First & Second Set Req. Admis. 2.)

{53} Plaintiff also supplemented his responses to Requests for Admission numbers 9 and 10 as follows:

9. Wolfram Count von Spreti was not authorized to sign Plaintiff Hilmar Leiber's name to the [Southlake Redemption Agreement, Arbor Redemption Agreement, or Gastonia Redemption Agreement].

<u>RESPONSE:</u>
Leiber admits he did not communicate to any person or entity express authority for Spreti to sign Leiber's name to the [Southlake Redemption Agreement, Arbor Redemption Agreement, or Gastonia Redemption Agreement], either specifically or by a more general communication of authority. Except as expressly admitted, denied.

10. No person or entity other than Hilmar Leiber was authorized to sign Leiber's name to the [Southlake Redemption Agreement, Arbor Redemption Agreement, or Gastonia Redemption Agreement].

<u>RESPONSE</u>:
Leiber admits that he did not communicate to any person or entity express authority for any person or entity other than Leiber to sign Leiber's name to the [Southlake Redemption Agreement, Arbor Redemption Agreement, or Gastonia Redemption Agreement], either specifically or by a more general communication of authority. Except as expressly admitted, denied

(Pl.'s Supp. Resp. Wachovia Bank's First & Second Set Req. Admis. 4.)

{54} As further required by the Court's April 18th Order, Leiber also provided supplemental responses to certain interrogatories. Leiber answered interrogatory number 10 as follows:

10. State whether you still contend "that Spreti acted as [Your] duly or apparently authorized agent in the receipt of the Wachovia Check or that Leiber constructively received the Wachovia Check," as alleged in paragraph 87 of your Complaint. If so, describe in detail the basis for this allegation, identifying all documents supporting the allegation and identifying all persons who have knowledge of any information supporting this allegation.

<u>RESPONSE</u>: Yes. The evidentiary basis for the allegation is that Spreti served as intermediary in brokering Leiber's investments in AAC Defendants' projects and Leiber received the payments referenced

in the immediately preceding response, a couple of reports and other correspondence from AAC, all of which has been previously produced, from Spreti, to the best of his knowledge, and did not communicate to the AAC Defendants to cease transmitting such items through Spreti. . . .

(Leiber also continues to contend, in the alternative, that Spreti was not his agent or that Spreti was the agent of the AAC Defendants.)

(Pl.'s Supp. Resp. Wachovia Bank's First & Second Set Interrogs. 2.) Leiber gave a virtually identical supplemental response to interrogatory number 11 regarding the B of A Check. (*See* Pl.'s Supp. Resp. Wachovia Bank's First & Second Set Interrogs. 2–3.)

{55} As a result of the supplemental responses, the AAC Defendants contend that it is undisputed that Spreti was in fact Leiber's agent, and they are entitled to summary judgment. Conversely, Leiber asserts that he complied with the Court's April 18th Order by admitting that he did not give express authority for Spreti to receive payment from the AAC Defendants on his behalf, but that there is still a genuine issue of material fact about whether the circumstances surrounding Leiber and Spreti's relationship give rise to a principal/agent relationship.

III.

SUMMARY JUDGMENT

A.

THE PARTIES' MOTIONS

{56} All Defendants have filed motions for summary judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure.

{57} Leiber is suing the AAC Defendants for unjust enrichment, breach of contract, reinstatement, conversion, breach of fiduciary duty, negligence, and unfair trade practices, claiming that Spreti was *not* authorized to sign the redemption agreements or receive the Checks on Leiber's behalf. (First Am. Comp. ¶¶ 47–82, 91–104.)

{58} Alternatively, Leiber is suing Wachovia and B of A for conversion of the Wachovia Check and B of A Check under North Carolina General Statute section 25-3-420(a) on a theory that Spreti *was* authorized to sign the redemption agreements and receive the Checks on Leiber's behalf. (First Am. Compl. ¶¶ 83–90.)

{59} The AAC Defendants have moved for summary judgment against Plaintiff on a theory that as a matter of law Spreti was Leiber's agent, and he had the authority to sign the redemption agreements in question and to receive the Checks on Leiber's behalf.

{60} Conversely, Wachovia contends, among other things, that as a matter of law, Spreti was not Leiber's agent, and therefore, Wachovia cannot be held liable for statutory conversion of the Checks because Leiber never received "delivery" of the Checks as required to make a statutory conversion claim.

{61} In the same vein, B of A has moved for summary judgment against Plaintiff on a theory that, as a matter of law, Spreti was not Leiber's agent, and therefore, B of A cannot be held liable for statutory conversion of the B of A Check because Leiber never received "delivery" of the B of A Check as required to make a statutory conversion claim.

{62} B of A has also filed a Cross-claim against Wachovia, alleging that if Leiber can maintain an action against B of A for conversion of the B of A Check, then B of A is entitled to summary judgment against Wachovia because Wachovia breached the presentment warranties upon presentment of the B of A Check with a forged payee indorsement.

{63} Wachovia has moved for summary judgment on B of A's Cross-claim on a theory that: (1) B of A is not liable to Leiber for conversion of the B of A Check; and, alternatively, (2) Wachovia did not breach the presentment warranties to B of A.

B.

LEGAL STANDARD

{64} Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C. R. Civ. P. 56(c). "An issue is 'genuine' if it can be proven by substantial evidence, and a fact is 'material' if it would constitute or irrevocably establish any material element of a claim or defense." *Lowe v. Bradford*, 30 N.C. 366, 369, 289 S.E.2d 363, 366 (1982). "It is not the purpose of the rule to resolve disputed material issues of fact but rather to determine if such issues exist." N.C. R. Civ. P. 56 cmt. The burden of showing a lack of triable issues of fact falls upon the moving party. *See, e.g., Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491, 329 S.E.2d 350, 353 (1985). Once this burden has been met, the nonmoving party must "produce a forecast of evidence demonstrating that [it] will be able to make out at least a prima facie case at trial." *Collingwood v. Gen. Elec. Real Estate Equities, Inc.*, 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989). The Court must exercise caution in granting a motion for summary judgment. *N.C. Nat'l Bank v. Gillespie*, 291 N.C. 303, 310, 230 S.E.2d 375, 379 (1976).

IV.

PRINCIPLES OF LAW

A.

AGENCY

{65} The first question for the Court on the present motions is whether the evidence gives rise to a genuine issue of material fact as to whether Spreti was Leiber's agent with authority to receive the Redemption Checks. Ultimately, the alternative liability of the AAC Defendants or the Banks turns on whether Spreti was or was not Leiber's agent. Based on the record in this case, the Court finds as a matter of law that Spreti *was* Leiber's agent for purposes of receipt of the Redemption Checks.

{66} The North Carolina Supreme Court has stated, "an agent is one who acts for or in the place of another by authority from the other." *Am. Tours, Inc. v. Liberty Mutual Ins. Co.*, 315 N.C. 341, 349, 338 S.E.2d 92, 97 (1986). An agency relationship arises "when parties manifest consent that one shall act on behalf of

the other and subject to his control." *Miller v. Piedmont Steam Co.*, 137 N.C. App. 520, 524, 528 S.E.2d 923, 926 (2000) (*citing Hayman v. Ramada Inn, Inc.*, 86 N.C. App. 274, 277, 357 S.E.2d 394, 397 (1987)). Typically, the issue of agency is a question of fact for the jury. *Vares v. Vares*, 154 N.C. App. 83, 87, 517 S.E.2d 612, 615 (2002). However, "if only one inference can be drawn from the facts then it is a question of law for the trial court." *Id.* (*citing Hylton v. Koontz*, 138 N.C. App. 629, 635, 532 S.E.2d 252, 257 (2000)). Thus, the Court must examine the evidence to determine whether genuine issues of material fact exist as to whether Spreti was Leiber's agent. While Leiber's ambiguous answers create some problems at the summary judgment stage, the Court believes that the evidence overwhelmingly establishes agency under either of four agency theories.

B.

ACTUAL AGENCY

{67}   "[I]n establishing the existence of an actual agency relationship, the evidence must show that a principal actually consents to an agent acting on its behalf." *Phillips v. Rest. Mgmt. of Carolina, L.P.*, 146 N.C. App. 203, 217, 552 S.E.2d 686, 695 (2001). In an actual agency relationship the agent can have (1) actual authority or (2) apparent authority. 12 Richard A. Lord, *Williston on Contracts* § 35.10 (4th ed. Westlaw) (2007).

{68}   Actual authority can be either express or implied. *Id.* "Express authority exists if the principal has delegated authority to the agent by words which expressly authorize the agent to do a delegable act." *Id.* (internal quotations omitted).

{69}   On the other hand, "[i]mplied authority depends on circumstantial proof of actual authority, and exists where appearances justify a finding that the agent was authorized to perform certain acts." *Id.* Implied authority "includes not only the authority to accomplish the precise act which the principal expressly authorized the agent to do, but the power to perform whatever acts are reasonably necessary to achieve that purpose." *Id.*

{70}   An actual agency relationship can also be based on the doctrine of "apparent authority." *See Ward v. Durham Life Ins. Co.*, 325 N.C. 202, 212, 381

S.E.2d 698, 703 (1989). Apparent authority allows an agent to affect the rights and liabilities of his principal outside the scope of his actual authority. *See Zimmerman v. Hogg & Allen, P.A.*, 286 N.C. 24, 30, 209 S.E.2d 795, 798–99 (1974). In *Zimmerman*, the doctrine of apparent authority was summarized as follows:

> The rights and liabilities which exist between a principal and a third party dealing with that principal's agent may be governed by the apparent scope of the agent's authority, which is that authority which the principal has held the agent out as possessing or which he has permitted the agent to represent that he possesses; however, the determination of a principal's liability in any particular case must be determined by what authority the third person in the exercise of reasonable care was justified in believing that the principal had, under the circumstances, conferred upon his agent.

*Id.* at 30–31, 209 S.E.2d at 799. Importantly, whether the agent was acting within the apparent scope of his authority is governed by the principal's conduct, not by any manifestations of the agent. *Id.* Put another way, "[t]he scope of the agent's apparent authority is determined not by the agent's own representations but by the manifestations of authority which the principal accords to the [agent]." Restatement (Second) of Agency § 27 (1958). Apparent authority may not, however, "be relied upon to assert that a principal authorized a certain transaction between its purported agent and a third party unless the third party *actually relied* upon the assertions of the principal regarding the purported agent's power at the time of the transaction." *Knight Publ'g Co. v. Chase Manhattan Bank, N.A.*, 125 N.C. App. 1, 15, 479 S.E.2d 478, 487 (1997) (emphasis in original).

## C.

## APPARENT AGENCY/AGENCY BY ESTOPPEL

{71} In the absence of actual agency, an agency relationship may be deemed to exist under the theory of "apparent agency" or "agency by estoppel." *Hayman*, 86 N.C. App. at 278, 357 S.E.2d at 397. The Court will hereinafter refer to both theories as "apparent agency." The theory of apparent agency has been stated as follows:

> Where a person by words or conduct represents or permits it to be represented that another person is his agent, he will be estopped to deny the agency as against third persons who have dealt, on the faith of such representation, with the person so held out as agent, even if no agency existed in fact.

*Id.* (*quoting Fike v. Bd. of Trustees*, 53 N.C. App. 78, 80, 279 S.E. 2d 910, 912 (1981)).

{72} Apparent agency is governed by the principles and policies governing equitable estoppel. *Deal v. N.C. State. Univ.*, 114 N.C. App. 643, 645, 442 S.E.2d 360, 362 (1994). "Equitable estoppel arises when one party, by his act, representations, *or silence* when he should speak, intentionally, or *through culpable negligence*, induces a person to believe that certain facts exist, and that person reasonably relies on and acts on those beliefs to his detriment." *Id.* (emphasis added). Equitable estoppel is a doctrine that aids a court "in the administration of justice when without its aid injustice would result." *Id.*

## D.

## APPARENT AGENCY V. APPARENT AUTHORITY

{73} The doctrines of apparent agency and apparent authority are often used interchangeably. They are, however, different. Apparent agency allows a *non-agent* to bind his putative principal. *See Hayman*, 86 N.C. App. at 278, 357 S.E.2d at 397. Conversely, apparent authority allows an agent to bind his principal to matters outside the scope of his actual authority. *See Zimmerman*, 286 N.C. at 30–31, 209 S.E.2d at 799. In sum, apparent authority only applies to an actual agent, whereas apparent agency applies to a non-agent. While there is a difference, these doctrines operate under very similar circumstances and rely on the same principles of equity.

## E.

## RATIFICATION

{74} Additionally, a principal can be held liable for an agent's unauthorized act when the principal subsequently ratifies the unauthorized act. *See, e.g., Inv. Prop. of Asheville, Inc. v. Allen*, 283 N.C. 277, 285–86, 196 S.E.2d 262, 267 (1973) ("A

principal is liable upon a contract duly made by his agent with a third person . . . when the contract, although unauthorized, has been ratified . . . .").  "Ratification is defined as 'the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him.'"  *Am. Travel Corp. v. Cent. Carolina Bank & Trust Co.*, 57 N.C. App. 437, 442, 291 S.E.2d 892, 895 (1982) (*citing* Restatement (Second) of Agency § 82 (1958)).  A principal must have intent to ratify plus full knowledge of all material facts.  *Bell Atl. Tricon Leasing, Corp. v. DRR, Inc.*, 114 N.C. App. 771, 776, 443 S.E.2d 374, 377 (1994).  "Ratification may be express or implied, and intent may be inferred from failure to repudiate an unauthorized act . . . or from conduct on the part of the principal which is inconsistent with any other position than intent to adopt the act."  *Id.* at 776–77, 443 S.E.2d at 377 (internal quotations omitted).

## F.

## PARTNERSHIP

{75}  Under North Carolina law, it is fundamental that partners are agents for each other for certain purposes.  *See Barnes v. Campbell Chain Co.*, 47 N.C. App. 488, 490, 267 S.E.2d 388, 390–91 (1980).  Specifically, section 59-39(a) of the North Carolina General Statutes states that "[e]very partner is an agent of the partnership for the purpose of its business."  N.C. Gen. Stat. § 59-39(a) (2007).  Furthermore, "[e]xcept as provided in [the Revised Uniform Limited Partnership Act] or in the partnership agreement, a general partner of a limited partnership has the rights and powers . . . of a partner in a partnership without limited partners."  N.C. Gen. Stat. § 59-403(a) (2007).

{76}  While in certain situations a person dealing with an agent must know the extent of the agent's authority, this is not the case when dealing with one who is a general agent, such as a general partner.  *Investors Title Ins. Co. v. Herzig*, 320 N.C. 770, 774, 360 S.E.2d 786, 788 (1987).  In the case of a general partner, "the burden is on the principal to show that the other party had notice of a restriction upon the power of the general agent."  *Id.*

V.

ANALYSIS

A.

EXPRESS ACTUAL AUTHORITY

{77} The principles of agency law discussed above must be applied to the facts of this case. First, the record is clear that Leiber did not communicate express authority to Spreti or anyone else regarding his investments in the United States. Leiber admitted that "he did not communicate to any person express authority for Spreti to receive the Wachovia Check, either specifically or by a more general communication of authority." (Pl.'s Supp. Resp. Wachovia's First & Second Reqs. Admis. ¶ 1.) Similarly, Leiber admitted that "he did not communicate to any person express authority for Spreti to receive the Bank of America Check, either specifically or by a more general communication of authority." (Pl.'s Supp. Resp. Wachovia's First & Second Reqs. Admis. ¶ 3.) There is no evidence contradicting these admissions.

B.

IMPLIED ACTUAL AUTHORITY

{78} Next, the Court turns to the issue of implied actual authority. As a matter of law, the Court finds that Spreti had implied actual authority to act on Leiber's behalf. There is circumstantial proof of Spreti's actual authority, and "appearances justify a finding that [Spreti] was authorized to perform certain acts." 12 Richard A. Lord, *supra*, at § 35.10. As a result, an actual agency relationship existed between Leiber and Spreti, and Spreti was authorized to receive the Redemption Checks and the documents from the AAC Defendants.

{79} Leiber did no due diligence with respect to his investments in the United States. Leiber invested $445,000 in the AAC Defendants based solely upon Spreti's advice. In making this substantial investment, Leiber never contacted any of the AAC Defendants directly. At all relevant times, Leiber managed his investment in the AAC Defendants through Spreti. For over fifteen years Spreti was the AAC Defendants' only contact regarding Leiber's investments. This undisputed evidence

justifies a finding that Spreti was authorized to perform certain acts on Leiber's behalf.

{80}   Moreover, the circumstances surrounding the execution of the investment documents are evidence of Spreti's implied actual authority.  It is undisputed that that: (1) Leiber testified his *only* contact was with Spreti; (2) he knows of nowhere else from which the investment documents could have come; (3) he did not read the investment documents or have them translated before signing; (4) he signed at least one document when Spreti came to visit him at his home; and (5) he signed at least one document because he "trusted" Spreti.  Taken together, these undisputed facts are circumstantial proof of Spreti's implied actual authority.

{81}   The Address of Notices field on the Southlake investment documents contained the name and address of an employee at a Swiss bank.  Leiber has suggested that this is some evidence that Leiber wanted someone other than Spreti handling his investments in the United States.  On its face, this argument seems reasonable.  After a review of the entire record, however, this argument is not persuasive.  Leiber testified at his deposition that he did not write anything in the Address of Notices field or have any idea who did.  Leiber went so far as to affirmatively testify that he did *not* want the Swiss bank to manage his investments.  Leiber further testified that he had reached *no* agreement with anyone regarding disbursements or notices concerning his investments in the AAC Defendants.

{82}   Leiber's conduct with respect to the disbursement checks also justifies a finding that Spreti was authorized to do certain acts on Leiber's behalf.  Within eighteen months of his initial investment Leiber received his first disbursement check from Spreti.  Upon receipt of this check, Leiber did not contact the AAC Defendants to object to Spreti receiving checks on his behalf.  Instead, for the better part of fifteen years, without objection, Leiber received approximately twenty checks relating to his investments in the United States from Spreti.

{83}   Finally, Leiber invested in Southlake, Arbor, and Gastonia, all of which are limited partnerships.  In the case of Arbor and Gastonia, Spreti was the general

partner. Given that all partners are agents for each other, Leiber's investment in Arbor and Gastonia indicates an agency relationship between Leiber and Spreti. *Barnes*, 47 N.C. App. at 490, 267 S.E.2d at 390.

{84} From the perspective of the AAC Defendants, they knew that Leiber had to be relying upon Spreti for investment advice because he had no other source of information. Their only contact with Leiber was through Spreti. They never had any direct contact, were never asked for information, and were never questioned about any transactions related to Leiber and handled by Spreti. They knew Leiber had invested in Arbor and Gastonia, in which Spreti was the general partner. The AAC Defendants had multiple indications that Spreti was authorized to act on behalf of Leiber and no indications that he was not authorized. In the exercise of reasonable care, the AAC entities were justified in believing that Leiber had conferred upon Spreti authority to handle his investments in the United States. The Court, therefore, finds as a matter of law that Spreti had implied actual authority to act on Leiber's behalf.

## C.

## APPARENT AUTHORITY

{85} Next, the Court turns to the issue of apparent authority. As a matter of law, the Court finds that Spreti had apparent authority to act on Leiber's behalf. There is undisputed evidence that Leiber held out Spreti as his agent. *See Zimmerman*, 286 N.C. at 30–31, 209 S.E.2d at 799. Additionally, Leiber permitted Spreti to represent to the AAC Defendants that he had authority to act on Leiber's behalf. *See id.* Based on Leiber's actions, the AAC Defendants were justified in believing that Leiber conferred upon Spreti the ability to act on his behalf. Under these facts, an actual agency relationship existed between Leiber and Spreti on the basis of apparent authority.

{86} Many of the same undisputed facts that support a finding of implied actual authority also support a finding of apparent authority. Specifically, Leiber invested in the AAC Defendants based solely on Spreti's advice. Leiber signed the investment documents without having them translated or read to him because he

"trusted" Spreti. Ultimately, Leiber invested nearly a half a million dollars without ever directly contacting any of the AAC Defendants or doing any due diligence. At all relevant times, Leiber managed his investment in the AAC Defendants through Spreti. By exclusively using Spreti to manage his investments for roughly fifteen years, Leiber held out Spreti to the AAC Defendants as having authority to act on his behalf. The AAC Defendants never dealt with anyone but Spreti. Based on this course of conduct, the AAC Defendants were justified in believing that Spreti had authority to act on Leiber's behalf.

{87} The circumstances surrounding the numerous disbursement checks also necessitate a finding of apparent authority. Within eighteen months of his initial investment Leiber received his first disbursement check from Spreti. From that point forward, Leiber knew that the checks were coming from Spreti, not directly from the AAC Defendants. Leiber failed to object to this practice upon receipt of the first check and any of the subsequent nineteen checks. Leiber's numerous failures to object gave Spreti apparent authority to receive checks for Leiber. No other conclusion can be drawn from these facts.

{88} Finally, Leiber invested significant funds in Arbor and Gastonia, both limited partnerships in which Spreti was the general partner. North Carolina law is clear that all partners are agents for each other concerning partnership business. *Barnes*, 47 N.C. App. at 490, 267 S.E.2d at 390. Receiving disbursement checks from partnership investments is partnership business. As such, the partnership is an indicator that an agency relationship existed between Leiber and Spreti. In effect, the partnership is a holding out by Leiber of an agency relationship with Spreti.

{89} Based on the foregoing, there is undisputed evidence that Leiber held out Spreti as his agent and that Leiber permitted Spreti to represent that he was Leiber's agent. Accordingly, the Court finds as a matter of law that Spreti had apparent authority to act on Leiber's behalf.

D.

APPARENT AGENCY

{90}   Next, the Court turns to the issue of apparent agency.  The Court finds as a matter of law that an apparent agency relationship existed between Leiber and Spreti.  There is undisputed evidence that Leiber, by his conduct, represented that Spreti was his agent.  Based on a course of conduct that existed for fifteen years, Leiber is now estopped to deny the agency relationship, even if no agency actually existed in fact. *Hayman*, 86 N.C. App. at 278, 357 S.E.2d at 397.  Accordingly, an apparent agency existed between Leiber and Spreti.

{91}   The undisputed facts that sustain a finding of implied authority and apparent authority also sustain a finding of apparent agency.  Leiber's investment in the AAC Defendants was at Spreti's direction.  Leiber testified that he trusted Spreti to make investments for him in the United States.  At no point prior to Spreti's suicide did Leiber have any direct contact with the AAC Defendants, despite the fact they had $445,000 of his money.  By exclusively using Spreti to manage his $445,000 investment for fifteen years, Leiber held out Spreti as having authority to act on his behalf.  With respect to Leiber's investment, the AAC Defendants knew of no one else with whom to communicate.  Given Leiber's conduct for over fifteen years, the AAC Defendants were justified in believing the Spreti had authority to act on Leiber's behalf.

{92}   Additionally, the circumstances surrounding approximately twenty disbursement checks dictate a finding of apparent agency.  Leiber received his first disbursement check within eighteen months of his initial investment.  Upon receipt of the first check, Leiber failed to question why the AAC Defendants were sending the disbursement checks to Spreti, as opposed to him directly.  Over the subsequent years, Spreti sent Leiber another nineteen disbursement checks.  At all relevant times, Leiber failed to object to Spreti receiving checks on his behalf or notify the AAC Defendants about an alternative arrangement.  Apparent agency is a legal principle based on equity, and Leiber's silence concerning the disbursement checks induced the AAC Defendants to believe an agency relationship existed between

Leiber and Spreti.  *See Deal*, 114 N.C. App. at 645, 442 S.E.2d at 362.  The AAC Defendants reasonably relied on Leiber's action to their detriment.  For that reason, the Court finds that an apparent agency existed between Leiber and Spreti, even if there was no actual agency relationship.

{93}  Finally, Leiber's investment in Arbor and Gastonia, limited partnerships in which Spreti was the general partner, is further evidence that an agency relationship existed between the two.  As the general partner, Spreti was an agent for all the limited partners with respect to partnership business.  Receiving disbursement checks on behalf of the limited partners is partnership business.  The partnership, and Leiber's general hands-off approach, was a holding out of Spreti's authority to act on Leiber's behalf.  As a result, the Court finds as a matter of law that an apparent agency existed and that Spreti was authorized to receive the Redemption Checks.

E.

RATIFICATION

{94}  Last, the Court examines the issue of ratification.  Assuming, *arguendo*, that Spreti was not authorized to receive the disbursement checks, Leiber's silence for fifteen years and after roughly twenty disbursement checks is a ratification of Spreti's unauthorized acts.  Ratification requires an intent to ratify and knowledge of all material facts.  *Bell Atlantic Tricon Leasing, Corp.*, 114 N.C. App. at 776, 443 S.E.2d at 337.  Leiber was aware of all material facts because he received numerous disbursement checks from Spreti over the course of fifteen years.  Leiber failed to object to Spreti receiving the disbursement checks on each and every occasion.  By failing to object, Leiber ratified Spreti's continued receipt of the disbursement checks.  Leiber's intent to ratify is inferred from his failure to repudiate Spreti's unauthorized acts.

## VI.
## CONCLUSIONS

{95}   Based on the foregoing, the undisputed evidence establishes an agency relationship between Leiber and Spreti, both directly and through principles of ratification and equity.  Accordingly, the AAC Defendants are entitled to summary judgment on each of Leiber's claims.

{96}   The AAC Defendants are entitled to summary judgment on Plaintiff's unjust enrichment claim.  As a result of the agency relationship that existed between Leiber and Spreti, payment to Spreti was payment to Leiber.  The AAC Defendants, therefore, were not unjustly enriched because they issued the Redemption Checks to Spreti as payment for the interests they purchased from Leiber.  Leiber's First Claim for Relief for unjust enrichment is **DISMISSED**.

{97}   The AAC Defendants are entitled to summary judgment on Plaintiff's breach of contract claim.  Leiber has failed to identify any specific provision in the Southlake, Arbor, or Gastonia partnership agreements that has been breached.  Without such a showing, the cause of action cannot survive summary judgment.  Moreover, Leiber has produced no evidence to show that a payment to which he was entitled did not reach Spreti, his duly authorized agent.  Accordingly, Leiber's Second Claim for Relief for breach of contract is **DISMISSED**.

{98}   The AAC Defendants are entitled to summary judgment on Plaintiff's claim for reinstatement/winding up partnerships.  The undisputed evidence shows that Leiber's interests in the AAC Defendants were redeemed by his duly authorized agent, Spreti.  The AAC Defendants compensated Leiber for his interests by issuing the Redemption Checks to Spreti.  Having sold his interests, Leiber is no longer a limited partner with standing to force a reinstatement and subsequent winding up of the partnerships.  Additionally, Leiber has failed to join the other limited partners whose interests would be affected by a reinstatement and subsequent winding up of the partnerships.  As a result of his redemption and his failure to join necessary parties, Leiber's Third Claim for Relief for reinstatement/ winding up is **DISMISSED**.

{99} The AAC Defendants are entitled to summary judgment on Leiber's breach of fiduciary duty claim. Leiber asserts that the AAC Defendants breached their fiduciary duties based on the handling of the various disbursements, the redemption agreements, and the winding up of the partnerships. Again, however, Leiber's agency relationship with Spreti defeats this claim. Leiber received the disbursements and properly redeemed his interests in the AAC Defendants through his duly authorized agent, Spreti. Further, the winding up of the partnerships was not a breach of a fiduciary duty because Leiber had already sold his interest in the partnerships to the AAC Defendants. Therefore, Plaintiff's Fourth Claim for Relief for breach of fiduciary duty is **DISMISSED**.

{100} The AAC Defendants are entitled to summary judgment on Leiber's negligence claim. Leiber asserts that the AAC Defendants breached their duty of reasonable care as a result of the way they handled the various disbursements, the redemption agreements, and the winding up of the partnerships. Leiber's agency relationship with Spreti, however, defeats this claim. Leiber received the disbursements and properly redeemed his interests in the AAC Defendants through his duly authorized agent, Spreti. In making payment to Leiber's duly authorized agent, the AAC Defendants did not breach their duty of reasonable care. Moreover, Leiber, having sold his interest in the partnerships to the AAC Defendants, was not owed a duty of reasonable care upon the winding up of the partnerships. Plaintiff's Fifth Claim for Relief for negligence is, therefore, **DISMISSED**.

{101} The AAC Defendants are entitled to summary judgment on Plaintiff's conversion claim. Plaintiff seeks to hold the AAC Defendants vicariously liable for conversion based on a theory that Spreti was the AAC Defendants' agent and he converted the checks intended for Leiber. However, the undisputed evidence shows that Spreti was Leiber's agent, not the AAC Defendants' agent. Payments to Spreti were payments to Leiber. As such, the payments to Spreti could not have been converted by the AAC Defendants. Accordingly, Leiber's Eighth Claim for Relief for conversion is **DISMISSED**.

{102} The AAC Defendants are entitled to summary judgment on Leiber's claim for unfair and deceptive trade practices. The undisputed evidence shows that Spreti was Leiber's agent, not the AAC Defendants' agent. Payments to Spreti were payments to Leiber. As such, the payments to Spreti cannot serve as the basis of an unfair and deceptive trade practices claim. Consequently, Leiber's Ninth Claim for Relief for unfair and deceptive trade practices is **DISMISSED**.

{103} In conjunction with his first five Claims for Relief, Leiber is seeking damages, both individually as well as derivatively, on behalf of Arbor and Gastonia. In North Carolina, a limited partner who is suing for damages individually cannot also pursue damages derivatively on behalf of the partnership, except in circumstances not relevant here. *See Energy Investors Fund, L.P. v. Metric Constructors, Inc.*, 133 N.C. App. 522, 526–27, 516 S.E.2d 399, 402 (1999); *Browning v. Maurice B. Levien & Co., P.C.*, 44 N.C. App. 701, 704, 262 S.E.2d 355, 357 (1980). This rule is intended to prevent a double recovery. *Energy Investors*, 133 N.C. App. at 527, 516 S.E.2d at 402. Moreover, assuming, *arguendo*, that Leiber could maintain derivative claims on behalf of Arbor and Gastonia, it is undisputed that Spreti was the general partner of both Arbor and Gastonia. As the general partner, Spreti was authorized to receive payment on behalf of both Arbor and Gastonia. Leiber has produced no evidence showing that a payment intended for Arbor or Gastonia was not delivered to Spreti, the general partner. As such, Leiber's derivative claims are **DISMISSED**.

{104} Based on the foregoing, the AAC Defendants' Motion for Summary Judgment is **GRANTED**.

## VII.
## THE BANKS' MOTIONS FOR SUMMARY JUDGMENT

{105} Plaintiff has alleged that the Banks converted the Redemption Checks. (First Am. Compl. ¶¶ 83–90.) Both Wachovia and B of A have moved for summary judgment against Plaintiff on the conversion claims. After reviewing the record and submissions of counsel, the Court finds that there are genuine issues of material

fact surrounding the conversion claims. Accordingly, the Court hereby **DENIES** Wachovia's and B of A's motions for summary judgment against Plaintiff.

## VIII.
### B OF A'S CROSS-CLAIM AGAINST WACHOVIA

{106} Finally, the Court turns to B of A's Motion for Summary Judgment on the Cross-claim. The Cross-claim alleges that if Leiber can maintain an action against B of A for conversion of the B of A Check, then B of A is entitled to summary judgment against Wachovia because Wachovia breached the presentment warranties upon presentment of the B of A Check with a forged payee indorsement. This issue is governed by the Uniform Commercial Code ("U.C.C."), which is codified in our statutes as N.C. Gen. Stat. §§ 25-4-101 through 25-9-710.

{107} Under sections 25-3-417(a) and 25-4-207.1(a) of the North Carolina General Statutes, a party presenting a check to a drawee bank warrants

> (1) [t]he warrantor is, or was, at the time the warrantor transferred the draft, a person entitled to enforce the draft or authorized to obtain payment or acceptance of the draft on behalf of a person entitled to enforce the draft; (2) [t]he draft has not been altered; and (3) [t]he warrantor has no knowledge that the signature of the drawer of the draft is unauthorized.

N.C. Gen. Stat. § 25-3-417(a); *see also* § 25-4-207.1(a). The Official Comments to Section 25-3-417 state that "[s]ubsection (a)(1) in effect is a warranty that there are no unauthorized or missing indorsements." N.C. Gen. Stat. § 25-3-417(a), Official Comment 2. The presentment warranties are breached if the check contains a forged indorsement. *United Carolina Bank v. First Union Nat'l Bank*, 109 N.C. App. 201, 205, 426 S.E.2d 462, 466 (1993).

{108} Upon breach of a presentment warranty, "[a] drawee making payment may recover from any warrantor damages for breach of warranty equal to the amount paid by the drawee less the amount the drawee received or is entitled to receive from the drawer because of the payment." N.C. Gen. Stat. § 25-3-417(b).

{109} In *Wachovia Bank, N.A. v. Fed. Reserve Bank of Richmond*, the Fourth Circuit Court of Appeals noted, "[t]hrough presentment warranties, the general scheme of the U.C.C. *shifts losses up the collection stream to presenting and depository banks*." 338 F.3d 318, 321–322 (4th Cir. 2003) (*citing* 2 White & Summers, *Uniform Commercial Code* § 18-7 (4th ed. 1995)) (emphasis added). The U.C.C.'s loss-shifting mechanism was further explained by *N.C. Nat'l. Bank v. Hammond*:

> [I]f a payor/drawee bank suffers a loss by paying a check over a proven forged indorsement, it may sue the collecting bank which presented the check to it on a theory of breach of warranty of good title. That collecting bank in turn may sue the next collecting bank and so on down the collection chain. Final liability for the check with a forged indorsement under the Uniform Commercial Code rests ultimately on the initial depository bank which presumably could have guarded against the loss by inspecting the indorsement more closely.

298 N.C. 703, 708, 260 S.E.2d 617, 621 (1979). This scheme places the liability for a forged indorsement "on the party most able to guard against it, the party taking the instrument from the forger himself." *Id.* at 709, 260 S.E.2d at 622. In this case, the liable parties would be the German banks—Dresdner and Oberbank.

{110} It is undisputed that Wachovia made the warranties enumerated in sections 25-3-417 and 25-4-207.1 of the North Carolina General Statutes. Wachovia expressly admitted to making such warranties in response to B of A's First Set of Interrogatories. (Wachovia Bank's Resp. Bank of Am. First Set Interrogs. 8.) There is no evidence in the record to suggest that the B of A Check was altered or that Wachovia had knowledge that Leiber's alleged signature was unauthorized. Accordingly, the only issue is whether Wachovia was entitled to enforce the draft. *See* N.C. Gen. Stat. §§ 25-3-417(a)(1), 25-4-207.1(a)(1).

{111} Wachovia warranted that the B of A Check did not contain a forged indorsement. It is undisputed, however, that Leiber's signature on the B of A check was a forgery. "Any adjudicated or noncontested forgery triggers this warranty." *Hammond*, 298 N.C. at 708, 260 S.E.2d at 621. Spreti negotiated the B of A Check at Oberbank. Oberbank transferred the B of A Check to Wachovia for collection.

Thereafter, Wachovia presented the check to B of A for payment, and B of A made payment in full. Because the B of A Check contained a forged indorsement, Wachovia breached the presentment warranties made to B of A. As a result, summary judgment on B of A's Cross-claim is proper if the Banks' defenses to the conversion claims fail. Wherefore, B of A's Motion for Summary Judgment on the Cross-claim is hereby **GRANTED**.

{112} Wachovia is free, however, to go "down the collection chain" because final liability under the U.C.C. "rests ultimately on the initial depository bank which presumably could have guarded against the loss by inspecting the indorsement more closely." *Hammond*, 298 N.C. at 708, 260 S.E.2d at 621. In this case, that liability rests on the German banks.


IX.

CONCLUSION

{113} Based on the foregoing, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED**:

    1. That the AAC Defendants' Motion for Summary Judgment is **GRANTED**;

    2. That Wachovia's Motion for Summary Judgment against Plaintiff is **DENIED**;

    3. That B of A's Motion for Summary Judgment against Plaintiff is **DENIED**; and

    4. That B of A's Motion for Summary Judgment on the Cross-claim is **GRANTED**.


    **IT IS SO ORDERED**, this the 8th day of July, 2009.